1  Donald E. J. Kilmer, Jr. [SBN: 179986]
   LAW OFFICES OF DONALD KILMER
2  1645 Willow Street, Suite 150
   San Jose, California 95125
3  Voice: (408) 264-8489
   Fax:   (408) 264-8487
4  E-Mail: Don@DKLawOffice.com

5  Jason A. Davis [SBN: 224250]
   Davis & Associates
6  27281 Las Ramblas, Suite 200
   Mission Viejo, CA 92691
7  Voice: (949) 310-0817
   Fax:   (949) 288-6894
8  E-Mail: Jason@CalGunLawyers.com

9  Attorneys for Plaintiffs

10

11                 UNITED STATES DISTRICT COURT
12          FOR THE NORTHERN DISTRICT OF CALIFORNIA
                      SAN JOSE DIVISION
13

14  TOM SCOCCA, MADISON          Case No.:    CV 11 01318 - JF
    SOCIETY, INC., and THE
15  CALGUNS FOUNDATION, INC.,    **SUPPLEMENTAL AUTHORITY**

16                               **Local Rule 7–3(d)(2)**
            Plaintiffs,
17                               **Current Date:   Aug. 26, 2011**
              vs.                **Current Time:    9:00 a.m.**
18                               **Courtroom 3, 5th Floor**
    SHERIFF LAURIE SMITH (In her
19  individual and official capacity.),  **Honorable Jeremy Fogel**
    COUNTY OF SANTA CLARA, and
20  DOES 1 to 20,

21
            Defendants.
22

23        Pursuant to Local Rule 7–3(d)(2), Plaintiffs hereby submit the attached

24  supplemental authority on the issue of fundamental rights being protected under a

25  Fourteenth Amendment Equal Protection claim.  A true and correct copy of the

26  Ninth Circuit Opinion in *Hoye v. City of Oakland*, Case No.: 09-16753 is attached.

27  Respectfully Submitted on August 10, 2011.     /s/ Donald Kilmer

28                                            Attorney for Plaintiffs

**Donald Kilmer**
Attorney at Law
1645 Willow St.
Suite 150
San Jose, CA 95125
Vc: 408/264-8489
Fx: 408/264-8487

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

WALTER B. HOYE, II,
                *Plaintiff-Appellant,*

v.

CITY OF OAKLAND,
                *Defendant-Appellee.*

No. 09-16753

D.C. No.
3:07-cv-06411-CRB

OPINION

Appeal from the United States District Court
for the Northern District of California
Charles R. Breyer, District Judge, Presiding

Argued and Submitted
October 8, 2010—San Francisco, California

Filed July 28, 2011

Before: Stephen Reinhardt and Marsha S. Berzon,
Circuit Judges, and Louis H. Pollak, Senior District Judge.*

Opinion by Judge Berzon

---

*The Honorable Louis H. Pollak, Senior District Judge for the U.S. District Court for Eastern Pennsylvania, Philadelphia, sitting by designation.

## COUNSEL

*For Plaintiff-Appellant Walter B. Hoye, II*: Michael Millen, Law Offices of Michael Millen, Los Gatos, California; Catherine B. Short (argued), Life Legal Defense Foundation, Ojai, California.

*For Defendant-Appellee City of Oakland*: Angela L. Padilla, Sarah C. Marriott, Benjamin C. Geiger, and Katherine C. Lubin, Greg J. Richardson (argued), Orrick, Herrington & Sutcliff LLP, San Francisco, California; John Russo and Vicki Laden, Oakland City Attorney's Office, Oakland, California.

*For Amicus Curiae American Center for Law and Justice*: Jay Alan Sekulow, Stuart J. Roth, Walter M. Weber, American Center for Law and Justice, Washington, D.C.

*For Amici Curiae California Women's Law Center, The California Black Women's Health Project, The Connecticut Women's Education and Legal Fund, The Feminist Majority Foundation, Equal Rights Advocates, Legal Momentum, Legal Voice, The California National Organization For Women, Physicians for Social Responsibility-Los Angeles, The Southwest Women's Law Center, the Women's Law Project, and The Women's Law Center of Maryland*: J. Cacilia Kim and Vicky L. Barker, California Women's Law Center, Los Angeles, California; Alexandra A. Bodnar, Casey J. T. McCoy, Squire, Sanders & Dempsey L.L.P., Los Angeles, California.

*For Amici Curiae Abortion Care Network, American College of Obstetricians and Gynecologists, American Medical Women's Association, American Nurses Association, Center for Reproductive Rights, Medical Students for Choice, National Abortion Federation, National Family Planning and Reproductive Health Association, and Physicians for Reproductive Choice and Health*: Janet Crepps & Jennifer Mondino, Center for Reproductive Rights, New York. New York.

*For Amici Curiae Planned Parenthood Affiliates of California, The California Medical Association, Alameda-Contra Costa Medical Association, Planned Parenthood Golden Gate, Planned Parenthood Los Angeles, Planned Parenthood Mar Monte, Planned Parenthood/Orange and San Bernardino Counties, Planned Parenthood of Santa Barbara, Ventura, & San Luis Obispo Counties, and Planned Parenthood: Shasta-Diablo*: Beth H. Parker & Rachel L. Chanin, Arnold & Porter L.L.P., San Francisco, California.

---

## OPINION

BERZON, Circuit Judge:

Throughout our nation's history, Americans have counted on the First Amendment to protect their right to ask their fellow citizens to change their mind. Abolitionists, suffragists, socialists, pacifists, union members, war protestors, religious believers, civil rights campaigners, anti-tax activists, and countless others have appealed to the principle, enshrined within the First Amendment, that in a democracy such as ours, public debate must be robust and free and that, for it to be so, the Constitution's protection of the freedom of speech must extend to the sidewalk encounter of the proselytizer and his prospective convert. These instances of public persuasion constitute the lifeblood of a self-governing people's liberty,

and so even when the beliefs propagated seem to some the
"rankest error" that "naturally would offend" any listener, our
founding charter deems such encounters "in the long view,
essential to enlightened opinion and right conduct on the part
of the citizens of a democracy." *Cantwell v. Connecticut*, 310
U.S. 296, 309-310 (1940). This case calls on us to apply that
principle.

****

Walter Hoye, a minister, is a so-called "sidewalk counsel-
or." He regularly stands outside a reproductive health clinic
in the City of Oakland, seeking to engage women in what he
calls a "friendly conversation" to dissuade them from having
an abortion.

Concerned about disruptive anti-abortion protests outside
clinics, the Oakland City Council enacted a so-called bubble
ordinance (the "Ordinance"), its name derived from the 100-
foot metaphorical "bubble" the Ordinance creates around the
entrances to reproductive health clinics. Within such zones,
the Ordinance makes it an offense knowingly and willfully to
approach within eight feet of an individual seeking entry to
the clinic if one's purpose in approaching that person is to
engage in conversation, protest, counseling, or various other
forms of speech. The Ordinance is largely modeled after the
Colorado statute held constitutional in *Hill v. Colorado*, 530
U.S. 703 (2000).[1]

Hoye was convicted of two separate violations of the Ordi-
nance. (His convictions were reversed on procedural grounds
during the pendency of this appeal.) He now challenges the
Ordinance in this § 1983 action, contending that the Ordi-
nance infringes upon the freedom of speech guaranteed by the
First Amendment to the United States Constitution. Hoye also

---

[1] Both the Ordinance and the Colorado statute are reproduced in an
appendix to this opinion.

argues that the Ordinance violates the federal constitution's Due Process Clause, as well as the state and federal guarantees of equal protection of the laws. A theme central to his challenges is his contention that Oakland does not enforce the Ordinance evenhandedly, as it has a policy of not enforcing the Ordinance against volunteers who engage in pro-abortion speech outside reproductive health clinics. The District Court granted Oakland's motion for summary judgment on all of Hoye's claims, and Hoye appealed. We now affirm in part, reverse in part, and remand for the determination of appropriate relief.

I.

A.

Several reproductive healthcare clinics are located within the City of Oakland (the "City"). For decades, anti-abortion activists have gathered outside them, trying to dissuade patients from seeking abortions and employees from performing them. Their insistent importuning has caused patients and employees to feel harassed, even intimidated. Also, in the past, protestors have blocked entrances to clinics, forcing patients and staff to climb through windows and fire escapes. Protestors have also sometimes mobbed patients' vehicles as they pull up to the clinic, preventing patients from stepping out.

Since approximately early 2006, Walter Hoye has stood outside the Family Planning Specialists clinic in Oakland, seeking to discourage women entering the clinic from having an abortion. Hoye's stated goal is "to have a personal, one-on-one conversation with each woman concerning her individual situation and what is causing her to consider abortion." He also often holds a sign proclaiming, "Jesus loves you and your baby. Let us help." He says that he has "never called a woman

a baby killer or murderer or told her she would rot in hell, or expressed any judgment like that."[2]

Hoye reports that "[f]or most of the time I have been going, there has been only two or three other pro-life people there." He also states that he has never seen a "pro-life counselor block patients from getting to the [c]linic"; instead, he says, "We consciously try to space ourselves out on the sidewalk . . . [and] make sure there is room to pass." Video recordings of Hoye's activities, although incomplete, corroborate Hoye's account of his sidewalk counseling.

For a number of years, "escorts" have helped patients approaching reproductive health clinics to navigate their way into the building when anti-abortion protestors are present. Hoye calls the escorts "pro-abortion activists." Barbara Hoke, an escort, provides a slightly different account: According to her, escorts are volunteers who, although not "legally affiliat-ed" with the clinics, wait outside them, often wearing bright orange vests bearing the name of the clinic in front of which they are volunteering. "The escort's job," in Hoke's words, "is to create a clear pathway to the clinic so that patients seek-ing to enter the clinic may do so without being intimidated, harassed, or feeling physically threatened."

Hoye charges that "[t]hese activist escorts tell women not to listen to [him], that he is only there to harass [them], that [they] will only be safe with the escorts, and [that they should] not . . . take his literature or information because it is inaccurate." Hoye also says that escorts, "with their bodies, form barriers" to prevent him from approaching patients, make noise (such as "lalalala") to drown out Hoye, and have "assign[ed] some of their number to stand in front of [Hoye] with blank pieces of cardboard, thus blocking women from seeing [Hoye's] sign." The City, by and large, does not con-

---

[2]There is no indication in the record to the contrary, nor any suggestion that Hoye has engaged in any physical obstruction or violence.

test Hoye's account of the escorts' activities. Also, at Hoye's criminal trial, Hoke to a degree confirmed that account, testifying that she thought it important for escorts "to block a message that is inappropriate, that is meant to harm, is meant to intimidate, and meant to prevent a woman from just the quiet privacy of a moment in her life that is no one else's business."[3]

On December 18, 2007, the Oakland City Council passed Ordinance No. 12849. Hoye filed the complaint in this case the next day, asking for a temporary restraining order. At a telephonic hearing on the request for a TRO, the District Court expressed reservations about the Ordinance's constitutionality and strongly suggested that the City amend it. The City, acquiescing, adopted an amended ordinance, Ordinance No. 12860, on February 5, 2008.

Section 3(b) of the Ordinance, as amended, makes it unlawful, within 100 feet of the entrance of a "reproductive health care facility," to

> willfully and knowingly approach within eight (8) feet of any person seeking to enter such a facility, or any occupied motor vehicle seeking entry, without the consent of such person or vehicle occupant, for the purpose of counseling, harassing, or interfering with such person or vehicle occupant.

The Ordinance then goes on to define the three activities it regulates—"counseling," "harassing," and "interfering"— quite broadly.

---

[3]The District Court ruled that Barbara Hoke's testimony in Hoye's criminal trial "is hearsay and does not meet the requirements of the former testimony exception in Fed. R. Civ. P. 804(b)(1)." But the City did not object to the evidence. "Defects in evidence submitted in opposition to a motion for summary judgment are waived absent a motion to strike or other objection." *FDIC v. New Hampshire Ins. Co.*, 953 F.2d 478, 485-86 (9th Cir. 1991) (quotation omitted).

We dwell on the definition of "counseling," as it is instructive for two reasons. First, the Ordinance defines "counseling" relatively expansively: "Counseling" means "engaging in conversation with, displaying signs to, and/or distributing literature." Ord. § 2(e). So, under the Ordinance, within 100 feet of a clinic, a speaker wishing to engage in conversation with, display signs to, or distribute literature to a person entering the clinic must first obtain that person's consent before approaching within eight feet of that person.

Second, the definition of "counseling" was one of the sections of the Ordinance amended at the suggestion of the District Court. Originally, the Ordinance had defined "counseling" so as to restrict only "engaging in conversation . . . displaying signs . . . and/or distributing literature . . . *in an effort to harass, intimidate, or persuade the individual not to access such reproductive health services.*" (Emphasis added). Thus, this provision, as originally enacted, was explicitly one-sided: A speaker who attempted to persuade a woman entering a reproductive health clinic *to* access reproductive health services was not "engaging in conversation" within the meaning of the Ordinance. Section (3)(b), the Ordinance's operative provision, reiterated the Ordinance's one-sided prohibition. It made it a misdemeanor to approach persons without consent for the purpose of counseling, harassing or interfering with them "*in connection with seeking reproductive health services, or for the purpose of interfering with that person's or vehicle occupant's obtaining or providing reproductive health services.*" Ord. § 3(b) (emphasis added). At District Judge Breyer's suggestion, the City amended the Ordinance to strike all of the language italicized above. As a result, the Ordinance on its face no longer distinguishes in the key operative provisions between pro-abortion and anti-abortion advocacy.

On May 13, 2008, the Oakland Police Department arrested Hoye and cited him for violating the Ordinance. An Alameda County jury convicted him, in January, 2009, of two counts

(for separate incidents) of "harassment of persons seeking health care" in violation of § 3(b) of the Ordinance. Hoye appealed his convictions to the Appellate Division of the same court, which reversed the convictions on two grounds, neither pertinent here. *See People v. Hoye*, 115 Cal. Rptr. 3d 876, (Cal. App. Super. Ct. 2010). Shortly after the parties argued this case before us, the district attorney dismissed the prosecution against Hoye.

In the meantime, in this federal action, the parties filed cross-motions for summary judgment. On August 4, 2009, the District Court granted the City's motion in full.

### B.

Oakland's ordinance is not the only legislative attempt to facilitate access to reproductive healthcare facilities by imposing special restrictions on speech and conduct in the space immediately outside clinic entrances. *See* Freedom of Access to Clinic Entrances Act, 18 U.S.C. § 248; California Freedom of Access to Clinic and Church Entrances Act, Cal. Penal Code §§ 423 *et seq.*; Cal. Penal Code § 602.11. Nor is this case the first to raise difficult questions concerning the accommodation of women's right to an abortion with anti-abortion activists' right to free speech. In the last two decades, the Supreme Court has three times addressed the First Amendment rights of anti-abortion protestors outside reproductive healthcare facilities. *See Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753 (1994); *Schenck v. Pro-Choice Network of Western New York*, 519 U.S. 357 (1997); *Hill v. Colorado*, 530 U.S. 703 (2000).[4]

---

[4]Since *Hill*, at least two circuits have decided cases involving so-called bubble ordinances and their application to circumstances involving sidewalk counselors and escorts. *See McGuire v. Reilly* (*McGuire I*), 260 F.3d 36 (1st Cir. 2001) (reversing a grant of a preliminary injunction against a statute's enforcement); *McGuire v. Reilly* (*McGuire II*), 386 F.3d 45 (1st Cir. 2004) (affirming the district court's decision to uphold the statute on the merits); *Brown v. City of Pittsburgh*, 586 F.3d 263 (3d Cir. 2009) (upholding parts of an ordinance similar to Oakland's, but striking down other parts); *see also McCullen v. Coakley*, 571 F.3d 167 (1st Cir. 2009) (upholding amended Massachusetts statute in face of a facial challenge).

In *Hill*, the third case in this trilogy, the Supreme Court upheld, in the face of a First Amendment challenge, a Colorado statute markedly similar to the Ordinance. *See* Colo. Rev. Stat § 18-9-122. The statute, like the Ordinance, created a buffer zone of 100 feet outside healthcare facilities. Within that zone, the statute prohibited knowingly approaching within eight feet of another person, without that person's consent, for the purpose of "passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling" that person. *Id.*

Because the Ordinance is modeled on the Colorado statute upheld in *Hill*, that opinion controls much of our analysis in this case and leads us to the conclusion that the Ordinance is a facially valid restriction on the time, place, and manner of speech. But *Hill* did not concern in any way the activities of escorts—that is, individuals engaged in counteracting the effect of anti-abortion protestors' speech by facilitating potential patients' access to clinics. Accordingly, there was no contention in *Hill* that Colorado enforced its statute only against anti-abortion speakers. In contrast, Oakland appears to have read into its Ordinance an exception for speech that facilitates access to reproductive health services and so has enforced the Ordinance against anti-abortion speakers but not pro-abortion speakers. We conclude that, in doing so, Oakland unconstitutionally suppresses speech based on the content of its message.

Further, because *Hill* did not concern activities similar to those of the escorts in this case, the Supreme Court did not consider whether it would be constitutional to apply an ordinance like Oakland's to speakers whose attempts to convey their message are systematically countered by those opposed to that message. In this opinion, we take up that question briefly and, guided by the principle that government must consider the actual conditions speakers encounter when it restricts their speech, explain that it may be unconstitutional to apply the Ordinance to speakers if, under the circumstances

surrounding a particular reproductive health clinic at a particular time, the application of the Ordinance would effectively foreclose speakers' ability to communicate their message. But because we would be required to speculate as to prospective facts, we leave the determination as to whether the Ordinance's application to Hoye actually has that effect for another day and a developed record.

For these reasons, we affirm the District Court's holding that the Ordinance is facially valid, but reverse the remainder of its ruling and remand with instructions to devise appropriate relief.

## II.

Before turning to the validity of Oakland's bubble ordinance, we must address an antecedent question, namely, whether we should decide this case at all in light of the "national policy forbidding federal courts to stay or enjoin pending state court proceedings except under special circumstances." *Younger v. Harris*, 401 U.S. 37, 41 (1971); *see Columbia Basin Apartment Ass'n v. City of Pasco*, 268 F.3d 791, 799-800 (9th Cir. 2001). "The *Younger* doctrine . . . counsels federal-court abstention when there is a pending state proceeding." *Moore v. Sims*, 442 U.S. 415, 423 (1979). State criminal proceedings against Hoye were commenced— and completed—during the pendency of this federal action.[5] But the circumstances in which federal courts should decline to exercise their jurisdiction "are carefully defined and remain the exception, not the rule." *Gilbertson v. Albright*, 381 F.3d 965, 969 n.2 (9th Cir. 2004) (en banc) (quotation omitted). We conclude that this case does not fit into the "carefully defined" *Younger* exception to mandatory federal jurisdiction.

---

[5]Neither party has raised the *Younger* doctrine, but it "may be raised sua sponte at any time in the appellate process." *Columbia Basin*, 268 F.3d at 799. That the state court proceedings have now ended is not alone a sufficient reason that *Younger* does not apply. *See Beltran v. California*, 871 F.2d 777, 782 (9th Cir. 1988).

Hoye filed this federal case in December, 2007, well before the district attorney filed a criminal complaint in state court on June 6, 2008. *Cf. Agriesti v. MGM Grand Hotels*, *Inc.* 53 F.3d 1000, 1001 (9th Cir. 1995) (holding that when a citation had issued but no charging document had been filed with state court, "there [were] no ongoing state judicial proceedings" for purposes of *Younger* abstention). Still, "where state criminal proceedings are begun against the federal plaintiffs after the federal complaint is filed but before any proceedings of substance on the merits have taken place in the federal court, the principles of *Younger v. Harris* . . . apply in full force." *Hicks v. Miranda*, 422 U.S. 332, 350 (1975). The commencement of state proceedings only ceases to require federal abstention after the federal court proceedings have moved beyond an "embryonic stage." *Doran v. Salem Inn*, *Inc.*, 422 U.S. 922, 929 (1975).

Here, the federal proceedings had begun nearly six months before the commencement of criminal proceedings in state court. By that time, the District Court had denied Hoye's motion for a temporary restraining order, it had held four status conferences and hearings in this case, and the City Council had amended the Ordinance in response to the District Court's expression of its deep reservations about the Ordinance's constitutionality. Thus, by the time state proceedings began, the federal proceedings had been long pending, and the District Court's intervention in the case had resulted in a significant change in the relative positions of the parties. We therefore conclude that the federal proceedings had progressed beyond an embryonic stage, so that "considerations of economy, equity, and federalism counsel against *Younger* abstention." *Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229, 238 (1984); *see id.* (concluding that "a federal court action in which a preliminary injunction is granted has proceeded well beyond the 'embryonic stage' "); *Adultworld Bookstore v. City of Fresno*, 758 F.2d 1348, 1350-51 (9th Cir. 1985) (holding that *Younger* abstention was not required when state criminal proceedings began after the district court had conducted

an "extended evidentiary hearing on the question of a preliminary injunction" but had not issued the injunction).

We therefore turn to consideration of the challenge to Oakland's "bubble ordinance."

### III.

**[1]** In *Hill*, the Supreme Court held that Colo. Rev. Stat § 18-9-122(3) was facially constitutional under the time, place, and manner analysis set forth in *Ward v. Rock Against Racism*, 491 U.S. 781 (1989), and *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288 (1984). *Hill*, 530 U.S. at 719-730. In those two cases, the Supreme Court explained that government may impose restrictions on speech in a public forum so long as the restrictions "[(1)] are justified without reference to the content of the regulated speech, [(2)] . . . are narrowly tailored to serve a significant governmental interest, and [(3)] . . . leave open ample alternative channels for communication of the information." *Ward*, 491 U.S. at 791 (quoting *Clark*, 468 U.S. at 293).

The relevant portions of the Ordinance largely replicate the Colorado statute the Supreme Court considered in *Hill*, so our analysis of the Ordinance's facial constitutionality is mostly controlled by that case.[6] But the Ordinance does depart from the Colorado statute in some details. We discuss the two most important such departures but conclude that they are not of decisive significance to the Ordinance's facial constitutionality.

---

[6]*Hill*'s reasoning, if not always its result, has been criticized by scholars of various stripes. *See* Colloquium, *Professor Michael W. McConnell's Response*, 28 Pepp. L. Rev. 747 (2001) (quoting criticisms of *Hill* by Profs. Michael McConnell, Laurence H. Tribe, Erwin Chemerinsky, and Akhil Amar).

### A.

The first significant difference between the Ordinance and the Colorado statute is that the Ordinance creates a buffer zone only outside of "reproductive health care facilit[ies]," Ord. § 3(b), although the Colorado statute created a buffer zone outside of all health care facilities, including hospitals. Colo. Rev. Stat § 18-9-122(3). In fact, the Ordinance does not apply to hospitals that provide reproductive health services or to reproductive health facilities operated or owned by hospitals.[7] The Ordinance's preamble suggests that the reasons hospitals, and clinics owned or operated by hospitals, are excluded are that "offices and facilities that have patient stays of shorter duration may be more vulnerable . . . on account of the layout and design of their facilities and parking areas as well as their staff deployment" and that "the facilities with the fewest resources for providing adequate security . . . are those not affiliated with hospitals."

Hoye contends that the narrower range of the Ordinance shows that it, unlike the statute in *Hill*, is not content-neutral. But we fail to see how, under *Hill*, the Ordinance's application to a narrower class of healthcare facilities could make it content-discriminatory. It is true that the Ordinance is more closely targeted to the kinds of facilities where anti-abortion activists are likely to gather. But *Hill* rejected as "flawed" the "theory that a statute restricting speech becomes unconstitutionally content-based because of its application to the specific locations where that discourse occurs." *Id.* at 724 (quotation omitted). Instead, the Supreme Court explained that the Colorado statute was content-neutral because it "was not adopted because of disagreement with the message" of the

---

[7]The Ordinance defines "a reproductive health facility" as "any facility that provides reproductive health services [defined elsewhere to include counseling and informational services] *that is not licensed as a hospital, and is not owned, and/or operated by a licensed hospital*." Ord. § 2(b) (emphasis added).

speech it regulates, *id.* at 719 (quotation omitted), and because "the statutory language makes no reference to the content of the [regulated] speech." *Id.; see id.* at 725 (explaining that the statute is content-neutral because it "is not limited to those who oppose abortion" and "it applies to all . . . demonstrators whether or not the demonstration concerns abortion"); *Ward*, 491 U.S. at 791 ("A regulation that serves purposes unrelated to the content of expression is deemed neutral, *even if it has an incidental effect on some speakers or messages but not others.*" (emphasis added)); *Menotti v. City of Seattle*, 409 F.3d 1113, 1129 (9th Cir. 2005) ("That Order No. 3 predominantly affected protestors with anti-WTO views did not render it content based.").[8]

For similar reasons, we cannot find a defect of constitutional proportions in the fact that the Ordinance regulates approaching a narrower class of individuals than the Colorado statute. The Colorado statute imposed restrictions on approaching *anyone* within the buffer zone, *see* Colo. Rev. Stat. § 18-9-122(3) ("No person shall knowingly approach another person . . . ." ), while the Ordinance only regulates knowingly approaching individuals "seeking to enter" the reproductive healthcare facility. Ord. § 3(b). The only reason that this departure from the Colorado statute might be relevant is that it might exacerbate the already disproportionate effect the Colorado statute may well have had on anti-abortion messages as compared to pro-abortion messages, or to messages on subjects having nothing to do with abortion. But, again, *Hill* instructs that, in regulating speech immediately outside reproductive health facilities, disproportionate effect is not of

---

[8]We need not—and do not—interpret these statements to mean that a disproportionate effect on one message *never* matters in determining whether a facially neutral regulation is content-based. It may be that in some circumstances a facially neutral regulation of speech will so disproportionately affect one message as to require a court carefully to consider the statute's terms to be sure that they do not incorporate a subtle content-based standard.

decisive significance to the content-neutrality inquiry. 530 U.S. at 724-25.

**[2]** In sum, given *Hill*, neither the fact that the Ordinance applies only to speech outside reproductive health care facilities, not hospitals generally, nor the fact that it protects only those "seeking to enter" the facilities renders it content-based.[9] Instead, we look to whether the Ordinance's substantive terms are content-based, and to whether the statute was enacted "because of disagreement with the message" of the speech it regulates, *Hill*, 530 U.S. at 719 (quotation omitted), to determine whether it is content-neutral.

B.

Hoye does not contend that the statute was enacted because of substantive disagreement with the message of the speech it regulates, nor does the record contain any evidence that it was. We must therefore examine whether the Ordinance's substantive terms make facial distinctions between categories of speech based on content.

**[3]** We begin again with a comparison with *Hill*, to see whether there are any differences that would render the Ordinance, but not the Colorado statute, content-based. The Ordinance does regulate slightly different categories of speech than the Colorado statute in *Hill*. The Colorado statute restricted approaching another person "for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with" that person. Colo. Rev. Stat. § 18-9-122(3). The Ordinance restricts approaching others "for the purpose of counseling, harassing,

---

[9]That the Ordinance's restriction on speech is limited to fewer locations than the Colorado statute does not make it more vulnerable to constitutional challenge at the narrow-tailoring or ample alternative channels stages of the time, place, and, manner inquiry. If anything, the opposite would appear to be true, as more locations remain available to the speaker.

or interfering with" them, § Ord. 3(b), and then defines "counseling," "harassing," and "interfering" so as to incorporate the same expressive activities restricted by the Colorado statute. *See* Ord. §§ 2(c), (d) & (e). But the Ordinance then describes in a new way the regulated category of speech: The Ordinance's definition of "counseling" includes "engaging in conversation," Ord. § 2(e), a category of speech not expressly restricted by the Colorado statute. Hoye makes no argument that this additional language in the Ordinance marks a decisive difference from the Colorado statute for purposes of the time, place, and manner inquiry. We do not see how it could.

**[4]** For one thing, the Colorado statute explicitly restricted "counseling" and "education," which are largely co-extensive with "engaging in conversation," especially in the circumstances to which the Ordinance applies. More importantly, *Hill* instructed that, when analyzing the face of a statute to determine its content-neutrality, the relevant question is whether the statute draws distinctions among *subjects* of discussion, not among *means or types* of communication. 530 U.S. at 723. Oakland's addition of an express restriction on "engaging in conversation" in no way changes the fact that it, like the Colorado statute, "applies equally to used car salesmen, animal rights activists, fundraisers, environmentalists and missionaries." *Id. Hill* therefore requires that we deem the addition of the "engaging in conversation" language immaterial to the Ordinance's facial content-neutrality.

The "engaging in conversation" language also does not meaningfully affect the narrow-tailoring and ample alternative channels of communication tests as those tests were applied by *Hill*. *Hill* concluded that the Colorado statute passed both these inquiries insofar as the spoken word is concerned because courts "must accord a measure of deference to the judgment of the . . . [l]egislature" as to whether "the 8-foot interval is the best possible accommodation of the competing interests at stake," *id.* at 727, and because the statute might "assist[ ] speakers' efforts to communicate their messages

[by] encourag[ing] the most aggressive and vociferous protestors to moderate their confrontational and harassing conduct, and thereby make it easier for thoughtful and law-abiding sidewalk counselors . . . to make themselves heard." *Id.* That analysis remains unaltered by Oakland's addition of the phrase "engaging in conversation" to the Ordinance.

## C.

Aside from pointing to differences between the text of the Colorado statute and that of the Ordinance, Hoye makes two additional attempts to explain why *Hill* is not fatal to his facial challenge to the Ordinance. Neither is persuasive.

Hoye's first such argument is more an attempt to reargue *Hill* than to distinguish it. He contends that the Ordinance is not content-neutral because it distinguishes between demonstrators' speech and "panhandling, solicitation and vending." None of the latter types of speech is expressly restricted by the Ordinance, even though they are expressive activities that raise similar concerns about "nuisance, the persistent importuning, the following, the dogging, and the implied threat of physical touching" as demonstrators' speech. *Id.* at 724.

The obvious flaw in this argument is that the Colorado statute upheld in *Hill* did not in terms prohibit panhandling, solicitation, or vending either. The Supreme Court nonetheless held that the Colorado statute "does not distinguish among speech instances that are similarly likely to raise the legitimate concerns to which it responds." *Id.* Hoye suggests, in effect, that *Hill* made a conditioned finding of content-neutrality (i.e., the statute was content-neutral as between "protest, education and counseling" and "casual conversation," *see id.* at 721-22), but possibly not as between protest and panhandling. Nothing in *Hill* suggests such a limited holding.

Hoye's second argument approaches one that we ultimately find persuasive as an aspect of the selective enforcement con-

sidered later, but it is not properly part of a facial challenge. As Hoye points out, in *Forsyth County v. Nationalist Movement*, the Supreme Court stated that "[i]n evaluating respondent's facial challenge, we must consider the county's authoritative constructions of the ordinance, including its own implementation and interpretation of it." 505 U.S. 123, 131 (1992). Hoye argues that this principle requires us to consider Oakland's enforcement practices in addressing his facial challenge. We disagree.

The Supreme Court followed its statement in *Forsyth* with three citations. All three are to portions of cases in which the Supreme Court used the past practice of a statute's implementation to *narrow* the statute to save it in the face of a vagueness challenge. *See Ward*, 491 U.S. at 795-796; *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 770 n.11 (1988); *Gooding v. Wilson*, 405 U.S. 518, 524-28 (1972). Hoye points to no instance in which a court has used evidence of a statute's implementation to make it *more* facially vulnerable. *Cf. McGuire II*, 386 F.3d at 58 ("Logically, there is no way (save perhaps when overbreadth is an issue) that an authority's non-binding and non-authoritative interpretation of a facially valid statute can make it more facially constitutionally vulnerable than it would be otherwise.").[10] Thus, although it is true that where "a well-understood and uniformly applied practice has developed that has virtually the force of a judicial construction," *City of Lakewood*, 486 U.S. at 770 n.11, courts may consider that executive practice for

---

[10]It is conceivable that an enforcement policy, even an unwritten one, could be inseparable from the statute or ordinance, so that the constitutionality of the statute or ordinance may depend on the constitutionality of the unwritten policy. *See, e.g.*, *Virginia v. Hicks*, 539 U.S. 113, 121 (2003) (considering the constitutionality of a written policy and an unwritten exception together because the Virginia Supreme Court had decided the two were not severable). Whether state laws are severable is, of course, a matter of state law. *See id.* We have no reason to think that California courts would find Oakland's unwritten implementation policy inseparable from the Ordinance as written.

purposes of a facial challenge, they may do so only to *save* a statute, not to condemn an otherwise valid one for being content-based.

Illustrative of this distinction is *Santa Monica Food Not Bombs v. Santa Monica*, 450 F.3d 1022 (9th Cir. 2006). In that case, we considered a written implementation instruction as an authoritative interpretation of a city ordinance, *id.* at 1035, and determined that the instruction provided an "adequate limiting construction" on certain provisions of the ordinance. *Id.* at 1042. At the same time, we concluded that the instruction "fatally undermine[d]" a different provision of the ordinance, but specifically held that the ordinance "*as implemented by the Instruction* . . . cannot be enforced," while noting that the ordinance itself "passes constitutional muster," and so could be enforced if implemented in a different manner. *Id.* at 1043.

This practice—relying on enforcement policies to save a statute from a facial challenge but not to invalidate a statute that is valid as written but not as enforced—is consistent with "the well-established principle that statutes will be interpreted to avoid constitutional difficulties." *Frisby v. Schultz*, 487 U.S. 474, 483 (1988). Moreover, it would make little sense to invalidate a statute that is constitutional as written when only its implementation is defective. Doing so would only require legislative bodies to undertake the pointless exercise of re-enacting laws that were perfectly valid as enacted on the first go around.

Hoye's evidence of Oakland's implementation of the Ordinance therefore cannot alter our conclusion that the Ordinance withstands Hoye's facial challenge. Nonetheless, Hoye's appeal to the City's enforcement practices is otherwise relevant. We understand Hoye to argue that the City enforces the Ordinance in a content-discriminatory manner, or—much the same point—that the rule that the City actually enforces, distinct from the Ordinance, is content discriminatory and

unconstitutional. It is to these essentially similar possibilities that we now turn.[11]

## IV.

We agree with Hoye that there are grave constitutional problems with the manner in which the City has understood and enforced its Ordinance. In considering the City's enforcement and application of the Ordinance, we follow an analysis that is precise and technical, perhaps regrettably so. But

_____

[11]Hoye's allegations of vagueness need not detain us. Hoye contends that the Ordinance's use of the terms "approach" and "consent" are impermissibly vague. But the Ordinance uses these terms in precisely the same manner as the Colorado statute. *See Hill*, 530 U.S. at 732-33. The Ordinance cannot therefore be vague in these respects for the same reasons that *Hill* held the Colorado statute not to be vague. *See id.*

To distinguish *Hill*, Hoye argues that the Ordinance only makes it unlawful to "willfully and knowingly approach within eight (8) feet of any person *seeking to enter*" a reproductive healthcare facility, Ord. § 3(b), not to approach a person *exiting* a healthcare facility. Hoye appears to be right: while the statute elsewhere refers to individuals exiting clinics, *see* Ord. §§ 2(d), (e) & (f), it does not in fact make it an offense to approach a person exiting the clinic. This omission is likely the result of a failure of legislative draftsmanship. But that the City thinks the Ordinance, as currently written, covers individuals leaving the clinics does not render the statute vague; the text is perfectly clear. An individual prosecuted by the City for counseling someone exiting the clinic would have a good defense, but that defense would lie in the Ordinance's text, not in the vagueness doctrine.

Hoye also observes that the statute restricts approaching "any occupied motor vehicle seeking entry" to a reproductive healthcare facility; he wonders "how long is [a vehicle] considered to be 'seeking entry' versus being simply parked at the curb?" Despite Hoye's protests to the contrary, this quibble amounts to pettifoggery. The only plausible reading of the Ordinance is that a vehicle is seeking entry so long as one of its occupants is seeking entry to the clinic. Unoccupied parked cars do not count. The Ordinance provides any person "of ordinary intelligence a reasonable opportunity to understand what conduct i[s] prohibited." *Hill*, 530 U.S. at 732; *see id.* at 733 (dismissing plaintiffs' vagueness challenge as involving no more than "hypertechnical theories as to what the statute covers").

beneath the doctrinal intricacies lie two simple principles: that government may not favor speakers on one side of a public debate, and that government must not substantially foreclose, as a practical matter, speakers' ability to communicate their message.

### A.

Hoye's challenge to Oakland's enforcement of the Ordinance relies primarily on three pieces of evidence concerning the City's enforcement policy: an Oakland Police Department training video, a Police Department training bulletin, and the deposition of an Oakland Police Department captain pursuant to Fed. R. Civ. P. 30(b)(6). The Oakland Police Department training materials outline the Ordinance in vague terms that do not deviate in any substantial way from the Ordinance itself, which we have held is facially constitutional. Captain Toribio's deposition, quoted at length below, is more troubling as it suggests a firm policy of enforcing the Ordinance essentially as it was written before being amended—that is, as applying only to efforts to persuade women approaching reproductive health clinics *not* to receive abortions or other reproductive health services, and not to communications seeking to encourage entry into the clinic for the purpose of undergoing treatment. That account is fully corroborated by—and we find dispositive—Oakland's admissions throughout this litigation that it understands and enforces the Ordinance in a content-discriminatory manner.

In response to Hoye's notice of deposition pursuant to Fed. R. Civ. P. 30(b)(6), Oakland produced Police Department Captain Toribio as the person most knowledgeable of Oakland's "policies, procedure, and interpretations relating to enforcement" of the Ordinance. Captain Toribio testified that "the City's enforcement policy is not to enforce the Bubble Ordinance against escorts acting as escorts." By this, Toribio apparently meant that the City does not enforce the Ordinance in such a manner as to require escorts to receive consent

before approaching patients to engage in speech with them.
Toribio's further testimony confirms this interpretation:

> Q. Now, if [an] officer . . . informs you that [an]
> escort had approached a woman within eight feet,
> without her consent, and said "Don't listen to the
> demonstrators," would that be considered to be a
> violation of the ordinance or not?
> THE WITNESS: Our policy is clear in what it says.
>
> A comment like that is not harassment or intimi-
> dating. It is language used to help facilitate their
> entrance into the facility or maybe even their exit.
>
> Q. If an escort were to say, "Don't take those leaflets
> they're going to try to hand to you," would that be
> considered a violation?
> THE WITNESS: No.
>
> Q. If an escort were to say "Those leaflets have inac-
> curate information in them, " would that be consid-
> ered a violation?"
> A. No.
>
> Q. If an escort were to say, "It's your right to have
> an abortion," would that be considered a violation?
> A. Our policy is clear. That would not be a violation
> of the policy.
>
> Q. And, again, I'm sorry. I may have taken a short-
> cut here in each one of these hypotheticals.
>
> I'm meaning an escort approaches within eight
> feet of a patient seeking to enter the facility without
> the patient's consent. And, again, that does not
> change your answer, that these escorts saying these

things is not a violation of the ordinance?
A. Correct.[12]

At oral argument, the City confirmed that it would not enforce the Ordinance against an escort who approached a patient, without consent, and said, "May I help you into the clinic?" but that it would enforce it against a sidewalk counselor who said, "May I talk to you about alternatives to the clinic?" The City explained its position as being that speech that "facilitates access" to the clinic does not trigger the Ordinance's consent requirement, while speech that does not facilitate access does trigger it.[13]

---

[12]The District Court ruled that many of the above questions were properly objected to as calling for speculation, and that Toribio's answers did not establish "that escorts make such statements, or that police turn a blind eye to them." But Toribio's answers were not speculative; instead, they simply stated, with some certainty, what the City's enforcement policy is. Moreover, all of the questions were asked in an attempt to ascertain the City's enforcement policy. In a sense, questions about a general policy are, by their very nature, always hypothetical: a policy provides what officers should do under certain hypothetical circumstances. We would be setting an impossibly high bar for plaintiffs if we were to require them to establish a municipality's policy and then to exclude as inadmissible a responsible police official's testimony as to what the municipality's policy is.

[13]At times, the City has seemingly formulated its position as being that speech that is incidental to facilitating access is not covered by the Ordinance. In distinguishing between incidental and purposive speech, we take Oakland to be arguing that there is a basis in the Ordinance to distinguish between escorts' speech and Hoye's speech because the Ordinance only restricts approaching "for the purpose" of engaging in various forms of communicative activity. The contention is that escorts acting as escorts do not approach patients for the purpose of engaging in the relevant forms of communicative activity; they approach for the purpose of guiding women into the clinic.

But Oakland's reliance on the Ordinance's "for the purpose of" language must be evenhanded if it is to be persuasive (or, for that matter, constitutional). If the escorts' speech does not violate the Ordinance because it is incidental to some non-communicative goal, then Hoye's speech could similarly be characterized as incidental to his goal of keeping women from entering the clinic and aborting their fetuses. Yet the City

On the face of the Ordinance, there is no distinction between speech facilitating access and speech that inhibits access. Of course, that distinction *used to* exist. The Ordinance, as originally enacted, singled out speech made "in an effort to harass, intimidate, or persuade the individual *not to access such reproductive health services*," Ord. § 2(f) (emphasis added) and "for the purpose of interfering with [a] person's . . . obtaining or providing reproductive health services." Ord. § 3(b). After the hearing on the application for a temporary restraining order, the City, at District Judge Breyer's suggestion, amended the Ordinance to remove the quoted language from the Ordinance's text. But, as Captain Toribio's deposition and the City's representations at argument make clear, the City continues to enforce the Ordinance as if the distinction remained. Embracing that distinction as the fulcrum of an enforcement policy, even for a facially valid enactment, is inconsistent with the First Amendment. We first explain why that is so, and then we consider the practical implications of the City's decision to read an unconstitutional distinction into a facially valid ordinance.

## B.

The City's policy of distinguishing between speech that facilitates access to clinics and speech that discourages access is not content-neutral. It is the epitome of a content-based speech restriction. "A regulation is content-based if . . . the regulation, by its very terms, singles out particular content for differential treatment." *Berger v. City of Seattle*, 569 F.3d 1029, 1051 (9th Cir. 2009) (en banc) (quotation omitted). "[T]he fundamental principle behind content analysis is that

---

clearly does not understand the Ordinance to exempt Hoye's speech. In any case, even if the distinction between purposive and incidental speech could coherently be made, we have said that privileging the latter over the former "turns the First Amendment on its head." *Foti v. City of Menlo Park*, 146 F.3d 629, 639 (9th Cir. 1998).

government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views." *Menotti*, 409 F.3d at 1128 (quotation omitted); *see also Rosenberger v. Rector & Visitors of the Univ. of Virginia*, 515 U.S. 819, 829 ("Viewpoint discrimination is . . . an egregious form of content discrimination"). In *Hill*, the Supreme Court reiterated these principles, holding that Colo. Rev. Stat. § 18-9-122 was content-neutral because it applies "to all protest, to all counseling, and to all demonstrators whether or not the demonstration concerns abortion, and *whether they oppose or support the woman who has made an abortion decision*." 530 U.S. at 725 (quotation omitted) (emphasis added). "That is the level of neutrality that the Constitution demands." *Id.*

**[5]** The City's enforcement policy does not meet this level of neutrality. To distinguish between speech facilitating access and speech that discourages access is necessarily to distinguish on the basis of substantive content. Asking a woman "May I help you into the clinic?" facilitates access; "May I talk to you about alternatives to abortion?" discourages it. Telling a woman, "It's your right to have an abortion!" facilitates access; telling her, "If you have an abortion, you will regret it!" discourages it. Here, the City has conceded, both at oral argument and through Captain Toribio's deposition, that its policy is to permit speech on one side of a controversial public debate, but not on the other. The City's implementation and enforcement of the Ordinance is therefore indubitably content-based.

Possibly the City reads *Hill* as authorizing the government to regulate speech so as to protect patients from any speech that offends their dignity or privacy, even if the offense stems not from the manner of speech but from the words that are spoken. Protecting privacy and dignity will often require distinctions between content: "You're a babykiller!" offends a woman's dignity and privacy; "It's your right to have an abortion!" often will not.

In some cases, government regulation of speech with the aim of protecting the dignity and privacy of individuals has been permitted. *See, e.g.*, *Frisby*, 487 U.S. at 484-87 (describing "the State's interest in protecting the well-being, tranquility, and privacy of the home" and permitting the State to "prohibit offensive speech [that is] intrusive" on that privacy (quotation omitted)); *cf. Berger*, 569 F.3d at 1054 (observing that the State may, in some cases, restrict speech to protect "the psychological [and] physical well-being of the [hospital] patient held 'captive' by medical circumstance"). But such cases do not sanction content-based restrictions. They only accept the dignity and privacy rationale as a sufficiently strong governmental interest to justify a content-neutral time, place, and manner restriction.

As the Supreme Court has recently explained, whether the State may regulate speech because of its offensive nature "turns largely on whether that speech is of public or private concern." *Snyder v. Phelps*, 131 S.Ct. 1207, 1215 (2011).[14] Regulations of speech in public fora on matters of public concern directed at others within the public forum must be content-neutral or survive strict scrutiny. "It is firmly settled that under our Constitution the *public* expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers." *Street v. New York*, 394 U.S. 576, 592 (1969) (emphasis added); *see Schenck*, 519 U.S. at 383 (explaining that "[a]s a general matter, we have indicated that in *public debate* our own citizens must tolerate

---

[14]For example, the First Amendment does not necessarily require a showing of actual malice by *all* plaintiffs seeking to recover for the torts of outrage or intentional infliction of emotional distress, but it does require that showing of plaintiffs who are "public figures and public officials." *Hustler Magazine v. Fallwell*, 485 U.S. 46, 55 (1988). "Deciding whether speech is of public or private concern requires [a court] to examine the content, form, and context of that speech, as revealed by the whole record." *Snyder*, 131 S.Ct. at 1216 (quotation omitted). But there can be no doubt that speech in a public forum on a controversial public matter directed at others within the public forum is speech of public concern.

insulting, and even outrageous, speech" (emphasis added) (quotation omitted)); *Boos v. Barry*, 485 U.S. 312, 322 (1988) (holding a regulation imposing a dignity standard on public speech inconsistent with the First Amendment); *Cantwell v. Connecticut*, 310 U.S. 296, 309 (1940) (protecting religious and political speech on a sidewalk even though it "naturally would offend . . . all . . . who respect the honestly held religious faith of their fellows"); *see generally* Robert C. Post, *The Constitutional Concept of Public Discourse: Outrageous Opinion, Democratic Deliberation, and* Hustler Magazine v. Falwell, 103 Harv. L. Rev. 601 (1990) (arguing that First Amendment doctrine prohibits the enforcement of rules imposing norms of civility and dignity on public discourse).

If *Hill* had upheld the Colorado statute as permissible because the sidewalk counselors' speech directed at patients seeking reproductive health services was not speech of public concern or because those patients were not truly engaged in public debate, an effort by the City to "facilitate access" by regulating offensive speech might come closer to passing constitutional muster. But while a few passages in *Hill* might suggest otherwise, *see* 530 U.S. at 716 (noting that "[t]he recognizable privacy interest in avoiding unwanted communication varies widely in different settings"), the Supreme Court ultimately upheld the Colorado statute *because* it determined the statute to be content-neutral, not because it held that the State could legitimately protect listeners from speech that was offensive only because of the words spoken. Nothing in *Hill* undermines the bedrock principle that regulations of public speech designed to protect listeners in public fora from substantively offensive speech are fundamentally incompatible with content-neutrality. Oakland's enforcement policy is therefore a content-based regulation of speech.

**[6]** "Content-based regulations are presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). A content-based regulation of public speech is only permissible if "it serves a compelling government interest in the least

restrictive manner possible." *Berger*, 569 F.3d at 1052. The City has made no argument that its policy of enforcing the Ordinance can survive such strict scrutiny. Indeed, no persuasive such argument can be made. While ensuring access to women's health care may well be a sufficiently compelling state interest for purposes of strict scrutiny, the City's enforcement policy is not the least restrictive means of pursuing that interest. "The existence of adequate content-neutral alternatives . . . undercuts significantly any defense" of a content-based regulation of speech. *R.A.V.*, 505 U.S. at 395 (quotation omitted). Enforcing the Ordinance as written, that is, as also applying to speech that encourages patients to enter the clinic, is a content-neutral alternative that is less inimical to the values at the heart of the First Amendment than the City's current policy of exempting such speech. The City has not made any attempt to show that exempting speech facilitating access from the Ordinance's strictures furthers the City's stated goal of providing access to reproductive health services, let alone to the degree that would allow us to conclude that the enforcement policy is the least restrictive means of ensuring access to reproductive health services. We therefore cannot conclude that the Ordinance, as understood and enforced by the City, is one of those "rare . . . regulation[s] restricting speech because of its content" that is nonetheless permissible. *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 818 (2000).

## C.

The apparent divergence in our two conclusions—that Oakland's bubble ordinance is facially constitutional but that the City interprets and enforces the Ordinance in an impermissibly content-based manner—is not unprecedented. In *Menotti*, for example, we concluded that Seattle's Civil Emergency Order No. 3 was a constitutional time-place-and-manner restriction on its face, 409 F.3d at 1142, but remanded for a trial on whether "it was the policy of the City to apply Order No. 3 in a manner that excluded only anti-WTO protestors."

*Id.* at 1148. Courts must be willing to entertain the possibility that content-neutral enactments are enforced in a content-discriminatory manner. If they were not, the First Amendment's guarantees would risk becoming an empty formality, as government could enact regulations on speech written in a content-neutral manner so as to withstand judicial scrutiny, but then proceed to ignore the regulations' content-neutral terms by adopting a content-discriminatory enforcement policy.

While courts must undoubtedly make doctrinal space for challenges to the content-discriminatory enforcement of content-neutral rules, it is not clear into which precise category of constitutional claims such challenges fit. *See, e.g.*, *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 325 (2002) (observing, without elaboration, that a pattern of denying waivers to disfavored speakers under an otherwise valid statute "would of course be unconstitutional"). The First Circuit has considered a challenge to a Massachusetts statute, similar to the Ordinance in many respects, that regulated speech in the space outside of clinics in which escorts and anti-abortion protestors were present. *See McGuire I*, 260 F.3d 36 (1st Cir. 2001) (reversing grant of preliminary injunction); *McGuire II*, 386 F.3d 45 (1st Cir. 2004) (affirming denial of permanent injunction). The *McGuire* cases upheld the Massachusetts statute as facially valid, *McGuire I*, 260 F.3d at 43-50; *McGuire II*, 386 F.3d at 56-69, and also rejected a challenge to the Commonwealth's enforcement of the statute, *McGuire II*, 386 F.3d at 59-65, classifying the selective enforcement challenge as an "as-applied" attack. Although we ultimately depart from its reasoning in some respects, we find the First Circuit's discussion of that "as-applied" challenge instructive.

The First Circuit explained that, in its view, "there are different types of as-applied attacks." *McGuire II*, 386 F.3d at 61; *see also Brown*, 586 F.3d at 289 (also considering "two types of as-applied challenges" to a bubble ordinance). While the "paradigmatic" type of as-applied challenge is one that

"tests" a statute's "constitutionality in one particular fact situation while refusing to adjudicate the constitutionality of the law in other fact situations," the First Circuit concluded that the sidewalk counselors must be making an as-applied challenge "of a different sort." *McGuire II*, 386 F.3d at 61. It explained that this second kind of as-applied challenge "must be based on the idea that the law itself is neutral and constitutional in all fact situations, but that it has been enforced selectively in a viewpoint discriminatory way." *Id.* at 62. "Such a challenge," it explained, "is dependent on the factual evidence provided as to how the statutory scheme has in fact operated vis-à-vis the plaintiffs." *Id.* The First Circuit then concluded that "some showing of intent on the part of government officials probably is necessary to make out" the second kind of as-applied First Amendment claim, *id.* at 63, before ultimately determining that there was no such evidence in the record. *Id.* at 65.

Our Circuit has taken a slightly different path. The First Circuit's "second" kind of as-applied challenge is essentially a selective enforcement claim that adopts the framework of *Yick Wo v. Hopkins*, 118 U.S. 356 (1886), but substitutes "speech content" for one of the more familiar protected classes, such as "race" or "national origin." We have made clear that such a claim is available, but have usually not categorized it as an "as-applied" First Amendment challenge. Instead, we have generally classified such challenges as selective enforcement equal protection claims. *See Foti*, 146 F.3d at 635 (distinguishing between a selective enforcement claim and an as-applied challenge and noting that the latter "does not implicate the enforcement of the law against third parties"; also observing that "[i]nadequate evidence of . . . alleged discriminatory enforcement of the ordinance does not defeat [an] as-applied challenge"); *Vlasak v. Superior Court ex rel. County of Los Angeles*, 329 F.3d 683, 690 (9th Cir. 2003) (explaining that the petitioner's "as-applied challenge appears to conflate her argument that the ordinance is unconstitutional as specifically applied to her and her claim of

selective prosecution"); *Rosenbaum v. City and Cnty. of San Francisco*, 484 F.3d 1142, 1152-57 (9th Cir. 2007) (considering a viewpoint discrimination claim as a selective enforcement claim under the Equal Protection Clause); *but cf. Menotti*, 409 F.3d at 1146-47 (referring to a selective enforcement challenge as an "as-applied" challenge).

Any difference between these two approaches is, at least in this case, semantic rather than substantive. Under both the First Circuit's "as-applied" approach and our standard "selective enforcement" approach, a plaintiff must show that a municipality's content-discriminatory enforcement of an ordinance is the result of an intentional policy or practice. *See McGuire II*, 386 F.3d at 63-64; *Brown*, 586 F.3d at 292; *Rosenbaum*, 484 F.3d at 1155; *Menotti*, 409 F.3d at 1147.

Because both the First Circuit's "as-applied" approach and our Circuit's selective-enforcement approach require that some official policy have caused the content-discriminatory enforcement, both approaches converge with a third analytical framework: namely, a facial challenge to the city's enforcement policy (as distinct from a facial challenge to the legislative enactment as written). Under both the First Circuit approach and the selective enforcement approach, plaintiffs are generally required to show the existence of an unconstitutional policy by extrapolating from a series of enforcement actions. They must argue, in effect, that these actions demonstrate that the municipality is enforcing against them a rule that is distinct from the constitutionally valid enactment. In other words, they "attack[ ] [an] unwritten policy as manifested in the [municipality's] application of its written [ordinance]." *Tipton v. Univ. of Hawaii*, 15 F.3d 922, 927 (9th Cir. 1994). Logically speaking, "[s]uch an attack bears much in common with a facial challenge on written policy." *Id.* The primary—indeed, perhaps only—difference is an evidentiary one. Plaintiffs have no difficulty establishing what a policy is when the policy is written. An unwritten policy, by contrast, is usually harder to establish. Often, the only way to establish

whether such a policy exists is to extrapolate from enforce-
ment data, in many cases a formidable task.

But that is not so in this case. Here, unlike in *McGuire II*
or any of the other cited authorities, the plaintiffs do not need
to extrapolate from concrete enforcement actions to determine
whether the government has a policy of enforcing the neutral
written rule in a content-discriminatory manner. Instead, the
City's own pronouncements definitively articulate a content-
discriminatory enforcement policy. As a result, the three ana-
lytical approaches—the First Circuit's "second kind" of as-
applied challenge, our Circuit's "selective enforcement" chal-
lenge, and a facial attack on an unwritten rule—converge in
all respects. Oakland has acknowledged having a policy of
enforcing the Ordinance based on the content of speech. That
policy is unconstitutional, no matter the analytical approach
taken.[15]

### D.

**[7]** Although the circumstances of this case do not require
us to choose the applicable doctrinal category, they do present
a remedial puzzle. Oakland insists that it has no enforcement
policy distinct from the Ordinance. Although we have no rea-
son to doubt that Oakland's content-based interpretation of
the Ordinance is made in good-faith, we reject that interpreta-
tion as a plausible reading of the Ordinance; indeed, if we did
not, we would have to declare the Ordinance facially invalid
under *Hill*.[16] In our view, Oakland is instead enforcing a dif-

---

[15]As noted, Hoye has advanced state and federal equal protection chal-
lenges to the Ordinance and its enforcement, in addition to his First
Amendment claims.

[16]The meaning of the Ordinance is ultimately a state-law question so it
would be "our duty, of course, to accept [an authoritative] state judicial
construction of the ordinance." *Shuttlesworth v. City of Birmingham*, 382
U.S. 87, 91 (1965). There is no pertinent such construction, however. And
we very much doubt that the California courts would interpret the Ordi-
nance as containing an exception for speech that "facilitates access" to the
clinic, as no such exception is apparent in the Ordinance's text, and the
addition of one would, far from preserving the Ordinance's constitutional-
ity, foreclose it.

ferent, unwritten, rule—one with an unmistakable resemblance to the old version of the Ordinance, the one that restricted engaging in conversation "in an effort to harass, intimidate, or persuade that individual not to access . . . reproductive health services." Because *that* rule—i.e., the Ordinance as erroneously understood by Oakland—is impermissibly content-discriminatory, we must craft a remedy designed to foreclose its continued enforcement, while preserving the facially valid Ordinance.

It would seem anomalous for a court to enjoin the enforcement of a facially constitutional Ordinance. On the other hand, it would be meaningless to enjoin Oakland's erroneous *interpretation* of the Ordinance: Oakland has insisted that there is no distinction between the actual Ordinance and what it enforces. In other words, there is no question that, under *Hill*, the City can restrict the speech of anti-abortion protestors like Hoye, but it is only constitutional for it to restrict anti-abortion protestors' speech under a rule that also restricts pro-abortion speech. The Ordinance, as written, is such a valid rule; the Ordinance as interpreted and enforced by Oakland is not. The question is how to ensure that the rule enforced by Oakland is a content-neutral one, i.e. the rule that we believe the Ordinance actually pronounces, and not a content-discriminatory rule, i.e., the rule that Oakland erroneously enforces.

**[8]** The District Court, with its greater familiarity with the facts and parties, is better positioned than we to address this remedial question. On remand, the District Court should enter declaratory judgment in favor of Hoye, declaring that (1) Oakland's policy of exempting speech "facilitating access" to clinics from the coverage of the Ordinance violates the First Amendment and that (2) the Ordinance, as written, does not exempt such speech and so is facially constitutional. If the District Court concludes that declaratory relief alone will be inadequate to change the City's enforcement policy (and that Hoye satisfies the standard criteria for injunctive relief), it

should then consider enjoining the City from continuing to enforce the Ordinance.[17]

## V.

**[9]** We have discussed what *McGuire II* called a "second kind" of as-applied challenge, addressing it as identical to a facial challenge to the City's enforcement policy. Hoye also brings a paradigmatic as-applied challenge, arguing that it is unconstitutional to apply the Ordinance to him because, given all the circumstances, his ability to communicate is unduly constricted. The First Circuit considered such a challenge but rejected it. *McGuire II*, 386 F.3d at 61. Again, we find the First Circuit's discussion helpful, but conclude in the end that we cannot resolve this challenge given our other holdings.

As a general matter, a facial challenge is a challenge to an entire legislative enactment or provision. See *Foti*, 146 F.3d at 635 (explaining that a statute is facially unconstitutional if "it is unconstitutional in every conceivable application, or it seeks to prohibit such a broad range of protected conduct that it is unconstitutionally overbroad") (internal quotation marks omitted). If it does not charge statutory overbreadth, "a facial challenge must fail where the statute has a plainly legitimate sweep." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (quotation omitted). A paradigmatic as-applied attack, by contrast, challenges only one of the rules in a statute, a subset of the statute's applications, or the application of the statute to a specific factual circumstance, under the assumption that a court can "separate valid from invalid subrules or applications." Richard H. Fallon, Jr., *As-Applied*

---

[17]Of course, even if the District Court enjoins Oakland's enforcement of the Ordinance altogether, the City could later apply for the injunction to be lifted or modified if it made a sufficient showing that it had adopted and would apply an evenhanded enforcement policy. See *Dombrowksi v. Pfister*, 380 U.S. 479, 492 (1965); *Younger v. Harris*, 401 U.S. 37, 50-51 (1971).

*and Facial Challenges and Third-Party Standing*, 113 Harv. L. Rev. 1321, 1334 (2000); see *Legal Aid Serv. v. Legal Aid of Oregon*, 608 F.3d 1084, 1096 (9th Cir. 2010) ("Facial and as-applied challenges differ *in the extent to* which the invalidity of a statute need be demonstrated." (quotation omitted) (emphasis in original)). Because the difference between an as-applied and a facial challenge lies only in whether all or only some of the statute's subrules (or fact-specific applications) are being challenged, the substantive legal tests used in the two challenges are "invariant." *Id.* (quotation omitted).

Applying these principles, the First Circuit in *McGuire II* first observed that the "plaintiffs d[id] not and cannot argue that they are different types of actors, or that they are involved in a different type of fact situation, from the ones on the basis of which the law was already upheld facially." *McGuire II*, 386 F.3d at 61. It reasoned then that the as-applied challenge brought by sidewalk counselors necessarily failed, because "the fact situation that [they] are involved in here is the core fact situation intended to be covered by this buffer zone statute, and it is the same type of fact situation that was envisioned by this court when the facial challenge was denied." *Id.* While we agree with the First Circuit's analytical framework, Hoye here argues that he is "involved in a different type of fact situation[ ] from the one[ ] on the basis of which the law was . . . upheld facially." *Id.*

Our facial analysis of the statute was controlled by *Hill*, a case in which there was no suggestion that the anti-abortion activists' ability to communicate in accord with the challenged statute was being impeded by the efforts of opposing speakers. In concluding that the Colorado statute, as a facial matter, was narrowly tailored and left open ample alternative channels of communication, the Supreme Court reasoned, for example, that "[s]igns, pictures, and voice itself can cross an 8-foot gap with ease." *Hill*, 530 U.S. at 729. That observation led the Supreme Court to the conclusion that the Colorado

statute would "not have any adverse impact on the readers' ability to read signs displayed by demonstrators." *Id.* at 726.

As noted at the outset, a valid time-place-and-manner regulation must "leave open ample alternative channels for communication." *Ward*, 491 U.S. at 791 (quotation omitted). "[A]n alternative is not ample if the speaker is not permitted to reach the intended audience." *Berger*, 569 F.3d at 1049 (quotation omitted). In the factual circumstances assumed in *Hill* and controlling our analysis as to the facial challenge, the Ordinance does leave "ample alternative channels for communication."

Hoye contends, however, that escorts regularly inhibit his speech by covering up his sign and drowning out his spoken words. The escorts have, of course, their own constitutionally protected free-speech interests at stake, including one in expressing their own firm conviction that the emotional well-being of women requires insulating them from those seeking to challenge, sometimes starkly and unpleasantly, their decision to consider an abortion procedure. Still, the escorts' free-speech interests do not diminish their on-the-ground impact on Hoye's prospects for communicating his message.

The First Circuit, and the District Court here, dismissed concerns about the impact of escorts' activities on antiabortion protestors' ability to communicate their messages on the basis that the escorts' interactions with sidewalk counselors were mere "private jousting in the speech marketplace," *McGuire II*, 386 F.3d at 60, involving no state action. That characterization is accurate to the degree the escorts are communicating opposing messages, as the First Amendment offers no protection against countervailing speech. *See Buckley v. Valeo*, 424 U.S. 1, 48-49 (1976).

As to the relevance of efforts by the escorts to prevent Hoye's message from being communicated, the factual predicate of an as-applied challenge does not need to be created by

the State. In *Hill*, for instance, the Supreme Court expressly invited as-applied challenges where "[s]pecial problems arise [because] clinics have particularly wide entrances or are situated within multipurpose office buildings." 530 U.S. at 730. The State does not design clinics with wide entrances or place them in multipurpose office buildings; instead, the only relevant state action would be the application of the statute to such factual settings. *Cf. Galvin v. Hay*, 374 F.3d 739, 754-55 (9th Cir. 2004) (sustaining an as-applied challenge in light of a "sight line partially obstructed by trees" relevant at the narrow-tailoring stage).

So whether the Ordinance is unconstitutionally restricting Hoye's speech is ultimately a causation question based on the particular facts: Does the Ordinance as applied to the actual circumstances—including the attempts by others to stifle Hoye's speech, as opposed to simply countering it with opposing messages—foreclose ample alternative channels of communication? In other words, Hoye will bear the burden of showing that it is the *Ordinance's requirement* that he obtain consent to approach, not the activities of escorts alone, that deprives him of ample alternative means of communication.

**[10]** In the end, we cannot determine on the present record whether Hoye can meet that burden. Any resolution of Hoye's paradigmatic as-applied challenge could only be relevant to future applications of the Ordinance. We have previously declined to entertain as-applied challenges that would require us to speculate as to prospective facts. *See, e.g.*, *Hotel Emp. & Rest. Emp. Int'l Union v. Nev. Gaming Comm'n*, 984 F.2d 1507, 1517 (9th Cir. 1993); *Polykoff v. Collins*, 816 F.2d 1326, 1338 (9th Cir. 1987); *cf. Wolfson v. Brammer*, 616 F.3d 1045, 1060 (9th Cir. 2010) (explaining that ripeness doctrine includes a "prudential component" that requires evaluation of "the fitness of the issues for judicial decision"). We have already held Oakland's application of the Ordinance to Hoye, under its current enforcement policy, unconstitutional because tainted by the content-discriminatory policy. Even if the

application of the Ordinance has in the past deprived Hoye of ample channels of communication, that defect may be cured if Oakland begins to enforce the Ordinance in an evenhanded manner. Consequently, Hoye's second kind of as-applied challenge is dependent on fluid and future facts.

## VI.

To recapitulate, we reach three separate conclusions.

First, the Ordinance is facially constitutional. That is to say, we do not find any relevant differences between the Ordinance's purpose and text and those of the Colorado statute that the Supreme Court held to be constitutional in *Hill*.

Second, as to Hoye's challenge to the enforcement of the Ordinance, we hold that Oakland's enforcement policy is a constitutionally invalid, content-based regulation of speech. By adopting that policy, Oakland has taken sides in a public debate in a manner that, as *Hill* itself explained, the Constitution does not permit. But because this problem is not a problem with the Ordinance itself, we remand this case to the District Court to craft a remedy that ensures that Oakland will adopt and henceforth apply a policy that enforces the Ordinance as written, that is, in an evenhanded, constitutional manner.

Third, as to Hoye's challenge to whether Oakland may apply the Ordinance to situations in which doing so would prevent him from communicating his message, we conclude that the success of the challenge depends on Oakland's future enforcement policy and the particular circumstances in which that policy may be applied. We therefore do not reach that challenge but also do not preclude Hoye from bringing such a challenge in the future.

For the foregoing reasons, we AFFIRM in part and REVERSE in part the ruling of the District Court. We

REMAND the case to the District Court with instructions to grant Hoye's motion for summary judgment in part and to grant him relief consistent with this opinion.

# APPENDIX

*mended Oakland City Council Ordinance No. 12860*[18]

WHEREAS, safe and unimpeded access to reproductive health care services is critically and uniquely important to the public health, safety, and welfare so that persons desiring or needing access to such services should not be intimidated, hampered, impeded, harassed, or restrained from obtaining those services; and

WHEREAS, persons attempting to access reproductive health care facilities to obtain reproductive health care services have been subject to harassing or intimidating activity from extremely close proximity, tending to hamper or impede their access to those facilities and services; and

WHEREAS such activity in close proximity subverts the right to privacy of those reproductive health care services, a right that is protected by the United States Constitution and the Freedom of Access to Clinic Entrances Act, U.S.C.S. Section 248, and is explicitly guaranteed in California's Constitution, Article I, Section 1, including the right to seek and obtain all health care services permitted under the laws of this States; and

WHEREAS, such activity interferes with a person's right to seek reproductive health care services and counseling which such persons are entitled to seek and obtain; and

WHEREAS, offices and facilities that have patient stays of shorter duration may be more vulnerable to such subversion of rights on account of the layout and design of their facilities and parking areas as well as their staff deployment; and

---

[18]Strikeout text shows amendments from originally enacted version.

WHEREAS, the facilities with the fewest resources for providing adequate security and safety to individuals seeking access to reproductive health services are those not affiliated with hospitals; and

WHEREAS, the adverse physiological and emotional effects created by such harassing or intimidating activities may pose health risks, interfere with medical treatment, diagnosis or recovery, or cause persons to delay or forego medical treatment; and

WHEREAS, this Ordinance does not preclude all protesting, picketing, demonstrating, leafleting, or educational activities near a facility providing reproductive health care services, and in particular, is not intended to preclude any lawful picketing, leafleting, and/or free speech, but is a necessary content-neutral time, place, and manner restriction intended to reconcile and protect the rights of persons rendering or seeking reproductive health care with the First Amendment rights of demonstrators; and

WHEREAS, existing federal and state laws do not adequately protect the rights of those seeking or providing health care services, now, therefore

THE COUNCIL OF THE CITY OF OAKLAND DOES ORDAIN AS FOLLOWS:

Chapter 8.50 is added to the Oakland Municipal Code to read as follows:

*Section 1. Title and purpose.*

This chapter shall be known as the "access to reproductive health care facilities ordinance." The City Council finds that every person in the City of Oakland has a basic and fundamental right to privacy protected by the United States Constitution and explicitly guaranteed in California's Constitution,

Article 1, Section 1, including the right to seek and obtain all health care services, permitted under the laws of this State. Central to this right is the need to secure access to all reproductive health care services. Access to these services is a matter of critical importance not only to the individual, but also to the health and welfare of all residents of the City of Oakland and the region. Intentional efforts to harass an individual or prevent that individual from exercising his or her right to seek and obtain reproductive health care services are therefore contrary to the interests of the people of Oakland.

This Ordinance is not intended to create any limited, designated, or general public fora. Rather it is intended to protect those who seek access to constitutionally protected reproductive health services from conduct which violates their rights.

*Section 2. Definitions.*

a. "Reproductive health services" refers to all medical, surgical, counseling, referral, and informational services related to ~~the human reproductive system, including services during pregnancy~~ or the termination of a pregnancy, whether such services are provided in a clinic, physician's office, or other facility other than a licensed hospital, but not if provided at a clinic or other facility owned and/or operated by a licensed hospital.

b. "Reproductive health care facility" refers to a facility licensed pursuant to Chapter 1 (commencing with Section 1200) of Division 2 of the Health and Safety code or any other facility that primarily provides reproductive health services that is not licensed as a hospital, and is not owned, and/or operated by a licensed hospital.

~~c. "Primarily" means 51% of more of the services provided.~~

~~d.~~ c. "Harassing" means the non-consensual and knowing approach within eight feet of another person or occupied

motor vehicle for the purpose of passing a leaflet or handbill, to display a sign to, or engage in oral protest, education, or counseling with such other person in a public way or on a sidewalk area within one hundred (100) feet of the entrance of a reproductive health care facility.

~~e.~~ d. "Interfering" means to restrict a person's freedom of movement or access to or egress from a reproductive heath care facility providing reproductive health services.

~~f.~~ e. "Counseling" means engaging in conversation with, displaying signs to, and/or distributing literature to individuals seeking access to, passage from, or services within the reproductive health care facility~~, in an effort to harass, intimidate, or persuade that individual not to access such reproductive health services.~~

~~g.~~ f. "Eight feet" shall be measured from any extension of the body of the individual seeking access to, passage from, or services within the reproductive health care facility, and/or the exterior of any occupied motor vehicle, to any extension of the body of, or any sign or object held by another person.

~~h.~~ g. "Providing reproductive health services" shall include doctors, nurses, any employee of a reproductive health care facility and volunteers who, with the consent of the reproductive health care facility, assist in conducting patients of such facility safely into the facility.

*Section 3. Prohibited harassment of individuals seeking access to health care facilities.*

a.    It shall be unlawful to use force, threat of force, or physical obstruction to intentionally injure, harass, intimidate, or interfere with or attempt to injure, harass, intimidate, or interfere with any person because that person will be, is, or has been, providing or obtaining reproductive health services.

b. Within 100 feet of the entrance of a reproductive health care facility, it shall be unlawful to willfully and knowingly approach within eight feet of any person seeking to enter such a facility, or any occupied motor vehicle seeking entry, without the consent of such person or vehicle occupant, for the purpose of counseling, harassing, or interfering with such person or vehicle occupant ~~in connection with seeking reproductive health services, or for the purpose of interfering with that person's or vehicle occupant's obtaining or providing reproductive health services.~~

c. Within 100 feet of the entrance of a reproductive health care facility, it shall be unlawful to willfully and knowingly approach within eight feet of any person seeking to enter such a facility, or any occupied motor vehicle seeking entry, for the purpose of injuring or intimidating such person or vehicle occupant in connection with seeking reproductive health services.

*Section 4. Enforcement.*

a. Any person who shall be convicted of a violation of subsection 3 above shall be deemed guilty of a misdemeanor and shall be punishable by imprisonment in the County jail for not more than one year, or by a fine not to exceed two thousand dollars ($2,000), or by both such fine and imprisonment.

b. Civil Remedies

i. Any person providing, seeking to provide, or seeking reproductive health services who is aggrieved by conduct prohibited by this chapter may commence a civil action in the Courts of the State of California.

ii. In any action commenced under subparagraph a. of this section, the court may award appropriate relief, including temporary, preliminary, or perma-

nent injunctive relief and compensatory and exemplary damages and reasonable fees for attorneys and expert witnesses. With respect to damages, at any time before final judgment, plaintiff may elect to recover, in lieu of compensatory damages, an award of statutory damages in the amount of $5,000.00 per violation.

*Section 5. Accomodation of Competing Rights.*

In adopting this legislation, the Oakland City Council recognizes both the fundamental constitutional right to assemble peacefully and to demonstrate on matters of public concern, as well as the right to seek and obtain health care. This legislation promotes the full exercise of these rights and strikes an appropriate accommodation between them.

Nothing in this Ordinance shall be construed to prohibit any expressive conduct (including peaceful picketing or other peaceful demonstration) protected from legal prohibition by the First Amendment to the United States Constitution, the California Constitution or any federal or California statute.

*Section 6. Severability.*

If any part, provision, or clause of this Ordinance or the application thereof to any person or circumstance is held to be invalid by a court of competent jurisdiction, all other provisions and clauses hereof, including the application of such provisions and clauses to other persons or circumstances, shall not be affected thereby and shall continue in full force and effect. To this end, the provisions of this chapter are severable.

### Colorado Revised Statutes § 18-9-22

(1) The general assembly recognizes that access to health care facilities for the purpose of obtaining medical counseling and

treatment is imperative for the citizens of this state; that the exercise of a person's right to protest or counsel against certain medical procedures must be balanced against another person's right to obtain medical counseling and treatment in an unobstructed manner; and that preventing the willful obstruction of a person's access to medical counseling and treatment at a health care facility is a matter of statewide concern. The general assembly therefore declares that it is appropriate to enact legislation that prohibits a person from knowingly obstructing another person's entry to or exit from a health care facility.

(2)   A person commits a class 3 misdemeanor if such person knowingly obstructs, detains, hinders, impedes, or blocks another person's entry to or exit from a health care facility.

(3)   No person shall knowingly approach another person within eight feet of such person, unless such other person consents, for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person in the public way or sidewalk area within a radius of one hundred feet from any entrance door to a health care facility. Any person who violates this subsection (3) commits a class 3 misdemeanor.

(4)   For the purposes of this section, 'health care facility' means any entity that is licensed, certified, or otherwise authorized or permitted by law to administer medical treatment in this state.

(5)   Nothing in this section shall be construed to prohibit a statutory or home rule city or county or city and county from adopting a law for the control of access to health care facilities that is no less restrictive than the provisions of this section.

(6) In addition to, and not in lieu of, the penalties set forth in this section, a person who violates the provisions of this sec-

tion shall be subject to civil liability, as provided in section
13-21-106.7, C.R.S.