UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TOM SCOCCA, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>SHERIFF LAURIE SMITH, *et al.*,<br><br>Defendants.<br>_____/ | No. C-11-1318 EMC<br><br>**ORDER GRANTING IN PART AND DEFERRING IN PART DEFENDANTS' MOTION TO DISMISS**<br><br>**(Docket No. 47)** |

Plaintiffs in this case are Tom Scocca, Madison Society, Inc. ("MS"), and Calguns Foundation, Inc. ("CGF"). They have filed suit against Defendants the County of Santa Clara and its sheriff, Laurie Smith, both in her official and individual capacity. According to Plaintiffs, Defendants have violated the Equal Protection Clause of the United States Constitution in the way that they have administered California Penal Code § 26150, which provides in relevant part that a sheriff of a county may issue a license to carry a concealed weapon ("CCW") to a person upon proof that, *inter alia*, "[t]he applicant is of good moral character" and that "good cause exists for issuance of the license." Cal. Pen. Code § 26150(a).[1] Mr. Scocca seeks both damages as well as injunctive and declaratory relief. MS and CGF seek only injunctive and declaratory relief.

---

[1] The Court acknowledges that, at the time that Mr. Scocca first applied for a "CCW" license, the relevant section of the Penal Code was § 12050. The Deadly Weapons Recodification Act of 2010 reorganized the statutes governing the control of deadly weapons, without changing their substance (effective January 1, 2012). *See* Docket No. 30 (Exhibit A). For ease of reference, the Court refers to the reorganized (*i.e.*, current) statutes.

Currently pending before the Court is Defendants' motion to dismiss Plaintiffs' first amended complaint ("FAC") pursuant to Federal Rule of Civil Procedure 12(b)(6). Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel and all supplemental briefing, the Court hereby **GRANTS** in part and **DEFERS** in part the motion to dismiss.

## I. FACTUAL & PROCEDURAL BACKGROUND

In their FAC, Plaintiffs allege as follows.

Mr. Scocca is a resident of Santa Clara County. *See* FAC ¶ 4. He is a member and/or associate of MS and CGF. See FAC ¶ 4. MS "is a membership organization whose purpose is preserving and protecting the legal and constitutional right to keep and bear arms for its members and all responsible law-abiding citizens." FAC ¶ 5. It assists its members "in obtaining and maintaining licenses to carry firearms for self-defense and for other Second Amendment purposes." FAC ¶ 5. CGF is a nonprofit organization which has, as one of its purposes, "defending and protecting the civil rights of California gun owners." FAC ¶ 6. Like MS, "CGF spends time and resources to assist its members . . . with exercising their Second Amendment rights," including in the "obtaining and maintaining [of] various licenses associated with exercising Second Amendment rights." FAC ¶ 6.

Plaintiffs have filed suit against both the County of Santa Clara and Sheriff Smith (in her official and individual capacity). Under California Penal Code § 26150, Sheriff Smith may issue a CCW license to a person upon proof that, inter alia, "[t]he applicant is of good moral character" and that "good cause exists for issuance of the license." Cal. Pen. Code § 26150(a). According to Plaintiffs, Sheriff Smith has issued more than 70 CCW licenses to Santa Clara County residents. *See* FAC ¶ 25.

Plaintiffs allege that, in November 2008, Mr. Scocca sent a letter of inquiry to Sheriff Smith asking for information about the process of obtaining a CCW license. *See* FAC ¶ 26. The sheriff apparently considered the letter of inquiry an application and denied the application for lack of supporting documentation. *See* FAC ¶ 26(b). In December 2008, Mr. Scocca sent a formal application for a license to Sheriff Smith. *See* FAC ¶ 27. After failing to get a response, Mr. Scocca

sent a letter in April 2009, requesting action on the application and/or an appeal. *See* FAC ¶ 28. Sheriff Smith denied the appeal on April 14, 2009. *See* FAC ¶ 29. In October 2010, Mr. Scocca sent a letter to the sheriff informing her of "changes in the laws with respect to the Second Amendment and requesting an interview." FAC ¶ 34. Attached to the letter was a "copy of a spreadsheet identifying license/permit holders by name which documented various attributes of those persons issued licenses." FAC ¶ 25. Although not entirely clear, it appears that one of the "attributes" described in the spreadsheet was a summary of each individual's good cause statement. Subsequently, in December 2010, a meeting was held involving, *inter alia*, Mr. Scocca and a representative for the sheriff. *See* FAC ¶ 34. The meeting did not result in any change in the sheriff's decision to deny Mr. Scocca's application for a CCW license.

According to Plaintiffs, Mr. Scocca should have been issued a license because he possesses good moral character (as required by § 26150) and because he has good cause for the issuance (as required by the statute). *See* FAC ¶¶ 30, 32. As to good moral character, Plaintiffs maintain that Mr. Scocca's moral character is "functionally equivalent to the good moral character of the more than 70 licensees with permits to carry concealed weapons issued by Sheriff SMITH." FAC ¶ 31.

As for good cause, Plaintiffs note that Mr. Scocca is the "Director of Security Risk Management at a large semiconductor equipment manufacturer with coroporate headquarters in Santa Clara County." FAC ¶ 32. According to Plaintiffs, Mr. Scocca "is at a competitive disadvantage in providing discreet executive protection as part of his private investigator business if he cannot carry a functional concealed firearm as part of the services he offers his clients." FAC ¶ 32(c). Plaintiffs also allege that part of Mr. Scocca's "investigative duties requires [him] to conduct surveillance of suspicious activity – which becomes of marginal utility if he is required to openly carry his firearm in connection with his work."[2] FAC ¶ 32(g). Plaintiffs assert that Mr. Scocca's good cause for seeking a CCW license "is functionally equivalent to the 'good cause' of some of the more than 70 licensees with permits to carry concealed weapons issued by Sheriff SMITH." FAC ¶

---

[2] Mr. Scocca "has a license issued by the California Bureau of Security and Investigative Services that permits him to openly carry a loaded firearm during the course and scope of his business." FAC 32(b).

3

33; *see also* FAC ¶ 25 (table) (noting that good cause statement for many applicants was related to the applicant's job – *e.g.*, business protection and private investigation services).

Based on, *inter alia*, the above allegations, Plaintiffs assert that Sheriff Smith should have issued a CCW license to Mr. Scocca and that her failure to do so amounted to a violation of equal protection in violation of the United States Constitution. The equal protection claim appears to have two components: (1) a violation of equal protection involving a fundamental right (*i.e.*, the rights protected by the Second Amendment) and (2) a violation of equal protection based on a class-of-one theory.

## II. DISCUSSION

### A. Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss based on the failure to state a claim upon which relief may be granted. *See* Fed. R. Civ. P. 12(b)(6). A motion to dismiss based on Rule 12(b)(6) challenges the legal sufficiency of the claims alleged. *See Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). In considering such a motion, a court must take all allegations of material fact as true and construe them in the light most favorable to the nonmoving party, although "conclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule 12(b)(6) dismissal." *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). While "a complaint need not contain detailed factual allegations . . . it must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than sheer possibility that a defendant acted unlawfully." *Iqbal*, 129 S. Ct. at 1949.

### B. Claim Against the County

In their papers, Defendants argue that the claim against the County should be dismissed because, when Sheriff Smith makes a decision as to whether to grant or deny a CCW license, she is acting as an agent of the state and not of the County. In other words, the County takes the position

that Plaintiffs have sued the wrong entity, namely, the County, when they should be suing the state (which is protected from damages liability under the Eleventh Amendment). Plaintiffs dispute such.

In resolving this issue, the Court takes guidance from the Supreme Court's decision in *McMillian v. Monroe County*, 520 U.S. 781 (1997). There, the plaintiff sued, *inter alia*, an Alabama sheriff for intimidating him into making false statements and suppressing exculpatory evidence. *See id.* at 784. On appeal, the Supreme Court addressed whether, under Alabama law, a sheriff acting in his law enforcement capacity is a policymaker for the county or the state.

In deciding this issue, the Court noted first that the question was not whether the sheriff acted for the state or county

> in some categorical, "all or nothing" manner. . . [W]e are not seeking to make a characterization of Alabama sheriffs that will hold true for every type of official action they engage in. We simply ask whether [the sheriff sued] represents the State or county when he acts in a law enforcement capacity.

*Id.* at 785-86. The Court went on to explain that, in deciding the issue of whether the sheriff represented the state or county, it would be guided by state law.

> This is not to say that state law can answer the question for us by, for example, simply labeling as a state official an official who clearly makes county policy. But our understanding of the *actual function* of a governmental official, in a particular area, will necessarily be dependent on the definition of the official's functions under relevant state law.

*Id.* at 786 (emphasis added).

Examining the law of Alabama, the Supreme Court began first with the state constitution, which, it concluded, supported the county's contention that the sheriffs represent the state, at least for some purposes. For example, the state constitution provided that sheriffs are deemed part of the state executive department, even though they are to be elected locally by county. *See id.* at 787 (adding that this was not always the case; sheriffs were added to the state executive department with the 1875 constitution). The Court also noted that

> [t]he framers of the 1901 Constitution took two significant steps in an attempt to solidify the place of sheriffs in the executive department, and to clarify that sheriffs were acting for the State when exercising their law enforcement functions. First, faced with reports

> that sheriffs were allowing mobs to abduct prisoners and lynch them, the framers made such "neglect" by sheriffs an impeachable offense.
>
> Second, authority to impeach sheriffs was moved from the county courts to the State Supreme Court, because of "the failure of county courts to punish sheriffs for neglect of duty."

*Id.* at 788. Finally, the Supreme Court took into account that "the Alabama Supreme Court has interpreted these provisions and their historical background as evidence of 'the framers' intent to ensure that sheriffs be considered executive officers of the state.'" *Id.* at 789.

The Supreme Court then turned to the state code. The provisions of the state code were not as compelling as those in the state constitution, but nevertheless still provided support for the conclusion that the sheriffs were representatives of the state when serving in their law enforcement capacities. Most notably, the state code provided that

> "it shall be the duty of sheriffs in their respective counties, by themselves or deputies, to ferret out crime, to apprehend and arrest criminals and, insofar as within their power, to secure evidence of crimes in their counties and to present a report of the evidence so secured to the district attorney or assistant district attorney for the county." By this mandate, sheriffs are given complete authority to enforce the state criminal law in their counties. In contrast, the "powers and duties" of the counties themselves – creatures of the State who have only the powers granted to them by the State – do not include any provision in the area of law enforcement. Thus, the "governing body" of the counties – which in every Alabama county is the county commission – cannot instruct the sheriff how to ferret out crime, how to arrest a criminal, or how to secure evidence of a crime. And when the sheriff does secure such evidence, he has an obligation to share this information not with the county commission, but with the district attorney (a state official).
>
> While the county commission thus has no direct control over how the sheriff fulfills his law enforcement duty, the governor and the attorney general do have this kind of control. Pursuant to § 36-22-5, they can direct the sheriff to investigate "any alleged violation of law in their counties." And after "proceeding promptly" to complete this investigation, the sheriff must "promptly" write a report to the state official in charge of the investigation, stating his findings, listing the witnesses he has secured, and summarizing what the witnesses can prove. In addition, the salaries of all sheriffs are set by the state legislature, not by the county commissions. § 36-22-16.

*Id.* at 790-91.

Notably, the Court acknowledged that there were four provisions that "cut in favor of the conclusion that sheriffs are county officials": (1) The sheriff's salary was paid out of the county treasury; (2) the county provided the sheriff with equipment, supplies, reimbursement for expenses, and so forth; (3) the sheriff's jurisdiction was limited to the borders of his county; and (4) the sheriff was elected locally by the voters in his county. *Id.* at 791. But, the Court held, these provisions were not "sufficient to tip the balance in favor of petitioner." *Id.* For example, "[t]he county's payment of the sheriff's salary does not translate into control over him, since the county neither has the authority to change his salary nor the discretion to refuse payment completely." *Id.* Also, "district attorneys and state judges are often considered (and in Alabama are considered) state officials, even though they too have limited jurisdictions and are elected locally." *Id.* at 792. The Court therefore concluded that "Alabama sheriffs, when executing their law enforcement duties, represent the State of Alabama, not their counties." *Id.* at 793.

Since *McMillian*, courts have had to address whether, under the law of a particular state, a sheriff represents the state or the county in a variety of different functions, including but not limited to law enforcement. Notably, the Ninth Circuit and the California Supreme Court have reached conflicting conclusions as to whether, under California law, a sheriff represents the state or county when he or she investigates a crime. In *Brewster v. Shasta County*, 275 F.3d 803 (9th Cir. 2001), the Ninth Circuit held that a sheriff is a representative of the county; in *Venegas v. County of Los Angeles*, 32 Cal. 4th 820 (2004), the California Supreme Court held that a sheriff is a representative of the state. Part of the disagreement arose from how the courts viewed Article V, § 13 of the California Constitution, which provides in relevant part that "the Attorney General shall be the chief law officer of the State," the Attorney General has the duty "to see that the laws of the State are uniformly and adequately enforced," and that the Attorney General

> shall have direct supervision over every district attorney and sheriff and over such other law enforcement officers as may be designated by law, in all matters pertaining to the duties of their respective offices, and may require any of said officers to make reports concerning the investigation, detection, prosecution, and punishment of crime in their respective jurisdictions as to the Attorney General may seem advisable.

7

Cal. Const., Art. V, § 13. While the California Supreme Court seemed to give this provision a fair amount of weight in *Venegas*, the Ninth Circuit, in *Brewster*, cautioned that the provision should not be taken too far, explaining as follows:

> Article V, section 13 . . . is a tool that aids the Attorney General in carrying out his duty "to see that the laws of the State are uniformly and adequately enforced." Such general law enforcement authority "does not contemplate absolute control and direction" of the officials subject to the Attorney General's supervision. On the contrary, sheriffs retain significant autonomy as the officials responsible for investigating crime within their respective counties.

*Id.* at 809.

*Brewster* and *Venegas*, of course, have limited application in the instant case because, here, the Court is not evaluating whether the sheriff acts as an agent of the state or the county when he or she investigates a crime. Rather, the Court is considering whether the sheriff acts as an agent of the state or county when he or she acts as the CCW licensing authority. *Cf. id.* at 806 (noting that "our analysis in *Streit* [where the Ninth Circuit considered whether the sheriff acts as a representative of the state or county when administering the county's policy for release from the local jail] does not resolve the question of Shasta County's liability in this case, because the sheriff's function of investigating crime was not at issue in *Streit*"). The Court thus looks to the general analytical framework provided by McMillian in deciding this issue – *i.e.*, how does state law treat a sheriff, in particular, when acting as a CCW licensor?

To the extent Defendants point to Article V, § 13 of the California Constitution (and related provisions in the California Government Code) in support of their position that the sheriff is an agent of the state, the Court does not find that state law dispositive. As noted above, Article V, § 13 references the law enforcement authority of sheriffs. But while CCW licensing bears some relationship to law enforcement (*i.e.*, because it concerns the control of deadly weapons), it is clearly more removed from the issue of law enforcement compared to, *e.g.*, the investigation of crime. Moreover, in *Brewster*, the Ninth Circuit emphasized that, at best, Article V, § 13 simply provides for general law enforcement authority on the part of the Attorney General and does not contemplate absolute direction and control by the Attorney General.

On the other hand, the Court also does not find dispositive provisions in the California Constitution and Government Code that designate sheriffs as county officers. *See* Cal. Const., art. XI, § 1(b) (providing that "[t]he Legislature shall provide for county powers, an elected county sheriff, an elected district attorney, an elected assessor, and an elected governing body in each county"); Cal. Gov't Code § 24000(b) (listing a sheriff as a county officer); *see also* Cal. Gov't Code § 25303 (providing that "[t]he board of supervisors shall supervise the official conduct of all county officers"). District attorneys are also designated county officers under the California Constitution and Government Code, see id. § 24000(a), but nevertheless have been deemed agents of the state, at least when acting as prosecutors. *See, e.g.*, *Weiner v. San Diego County*, 210 F.3d 1025, 1030 (9th Cir. 2000); *Pitts v. County of Kern*, 17 Cal. 4th 340, 362 (1998).

Furthermore, the Court does not find dispositive provisions in the California Government Code that "[t]he board of supervisors shall prescribe the compensation of all county officers," Cal. Gov't Code § 25300, and that "the office of sheriff shall be filled by election as provided [in Chapter 5 of the Government Code] for elective county officers." *Id.* § 24205. Significantly, *McMillian* did not find similar provisions in Alabama law controlling. *See McMillian*, 520 U.S. at 791-92 (not finding provisions that a sheriff is paid out of the county treasury or elected locally by the voters in his or her county dispositive).

What the Court finds most instructive are the provisions in the California Penal Code that deal with CCW licensing. Notably, these provisions do not suggest that the county board of supervisors or other county administrator (other than the sheriff) exercises control or oversight over CCW licensing. This stands in contrast to the situation in *Streit v. County of Los Angeles*, 236 F.3d 552, 561 (9th Cir. 2001) where the court concluded that a sheriff acts for the county and not the state when overseeing and managing a local jail, not only because, *e.g.*, the sheriff is designated a county officer under the California Constitution but also because "*[t]he counties retain the power* to transfer control of a county jail from the sheriff to a county-created department of corrections, suggesting that the counties actually control and operate the jails, and not the state via the sheriffs." (Emphasis added.) Rather, the relevant code provisions in the case at bar clearly delineate a role for the state with respect to administration and oversight.

9

For example, California Penal Code § 26175 provides that applications for such licenses – as well as applications for amendments to licenses, amendments to licenses, and licenses – "shall be uniform throughout the state, upon forms to be prescribed by the Attorney General." Cal. Pen. Code § 26175(a)(1). Section 26185 provides that the fingerprints of applications shall be taken on forms prescribed by the Department of Justice and shall be forwarded to the same. *See id.* § 26185(a)(1). Section 26225 provides that a sheriff or other licensing authority must file a copy of a denial of a license, a denial of an amendment to a license, the issuance of a license, the amendment of a license, or the revocation of a license with the Department of Justice. *See id.* § 26225(b). Finally, § 26195 provides that a license "shall not be issued if the Department of Justice determines that the person is prohibited by state or federal law from possession, receiving, owning, or purchasing a firearm," *id.* § 26195(a), and that a license

> shall be revoked by the local licensing authority if at any time either the local licensing authority is notified by the Department of Justice that a licensee is prohibited by state or federal law from owning or purchasing firearms, or the local licensing authority determines that the person is prohibited by state or federal law from possessing, receiving, owning, or purchasing a firearm.

*Id.* § 26195(b)(1). In light of the above provisions, the Court cannot say that there has been a "'sufficiently *complete*'" delegation of local police power from the state to the sheriff "'such that a suit for abuse of that power is not a suit against the State.'" *Streit*, 236 F.3d at 563 (emphasis added).

In the attempt to downplay the impact of the above provisions, Plaintiffs attack § 26195, arguing that this provision is simply a "safety net" which gives the Department of Justice only the narrowest form of review. Plaintiffs emphasize that the provision merely allows the Department to deny a license where, *e.g.*, the applicant is a felon and therefore barred from owning a firearm; it does not give the Department the authority to overrule a sheriff's discretionary decision to grant or deny a license.

While Plaintiffs' argument is not without some force, the Court does not find it persuasive. First, the Court is obligated to consider not only § 26195 but also the other Penal Code provisions

cited above. Taken together, the provisions demonstrate that the state has an important oversight role, even if the degree of actual oversight is limited.

Second, Plaintiffs' argument leaves out an important consideration regarding the CCW licensing scheme – namely, that the sheriff has the power to grant a license which conveys a right exercisable throughout the state and thus has a statewide effect. While there are some exceptions, *see, e.g.*, Cal. Pen. Code § 26220(b) (providing that, "[i]f the licensee's place of employment or business was the basis for issuance of a license . . . [,] [t]he license shall be valid only in the county in which the license was originally issued"); *id.* § 26150(b)(2) (providing that, "[w]here the population of the county is less than 200,000 persons," a sheriff may issue a license "to carry loaded and exposed in only that county a pistol, revolver, or other firearm capable of being concealed upon the person"), the general rule is that a license has applicability beyond the county borders. Hence, the sheriff, at least in the case of Santa Clara County, acts on a statewide, not countywide, matter in administering the CCW licenses. *Cf. Del Campo v. Kennedy*, 491 F. Supp. 2d 891, 900 (N.D. Cal. 2006) (Ware, J.) (in finding the district attorney to be a county agent with respect to the administration of a certain program, noting that "[t]he history of the statutory scheme leads the Court to conclude that the legislature had no intention of implementing a state-wide diversion program" and that "[i]t is clear that the diversion programs are local programs implemented on behalf of the county").

Accordingly, the Court agrees with Defendants that Santa Clara County is not an appropriate defendant in this action because Sheriff Smith, when making her decisions on granting or denying CCW licenses, acts as a representative of the state of California, and not of the County. Plaintiffs have failed to point to any state law provisions sufficiently establishing to the contrary. *See Rojas v. Sonoma County*, No. C-11-1358 EMC, 2011 U.S. Dist. LEXIS 122276, at *11 (N.D. Cal. Oct. 21, 2011) (taking into account plaintiff's failure to point to any authority support his position that sheriff acts as a county agent when providing courtroom security services).

///

///

///

11

C.  Claim Against Sheriff Smith in Her Official Capacity

  1.  Damages

Because Sheriff Smith is an agent of the state, the claim against her in her official capacity must be construed as a claim against the state. It is well established law that the Eleventh Amendment provides immunity to a state where the claim is one for monetary damages. *See Flint v. Dennison*, 488 F.3d 816, 824-25 (9th Cir. 2007) (noting that the Eleventh Amendment bars damages actions against state officials in their official capacity). Accordingly, the Court dismisses with prejudice the damages claim against Sheriff Smith in her official capacity.

  2.  Prospective Injunctive or Declaratory Relief

That still leaves, however, the claim for injunctive and declaratory relief, which is not barred by the Eleventh Amendment to the extent it is prospective in nature. *See id.* at 825 (noting that, under *Ex parte Young*, 209 U.S. 123 (1908), "a suit for prospective injunctive relief provides a narrow, but well-established exception to Eleventh Amendment immunity").

Defendants, of course, challenge the equal protection claim, even if limited to prospective injunctive or declaratory relief, on other grounds. Here, the Court must address the two different components of Plaintiffs' equal protection claim. As noted above, Plaintiffs' equal protection claim is based on two different theories: (1) an equal protection violation implicating a fundamental right (i.e., the Second Amendment) and (2) an equal protection violation based on a class-of-one theory.

    a.  Fundamental Right-Based Claim

As to the first equal protection claim, the parties agreed that the Court should stay proceedings pending a ruling by the Ninth Circuit in *Richards v. County of Yolo*, No. 11-16255, and *Peruta v. County of San Diego*, No. 10-56971. The cases will likely address legal issues that have direct relevance for the case at bar – *i.e.*, the scope of the right to bear arms under the Second Amendment, particularly as related to a CCW license. This in turn may inform the fundamental right analysis under the equal protection claim.

    b.  Class-of-One Claim

As to the second equal protection claim, it does not depend upon a fundamental right, and therefore, the Court may address this claim irrespective of *Richards* and *Peruta*. A class-of-one

equal protection claim does not depend upon a suspect classification such as race or gender. Such a claim arises where the plaintiff was (1) "intentionally treated differently from others similarly situated" and (2) "there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

In their papers, Defendants argue that a class-of-one claim cannot be raised where discretionary decisions – such as those here (involving assessments of good moral character and good cause) – are being challenged. They cite in support *Engquist v. Oregon Department of Agriculture*, 553 U.S. 591 (2008). In *Engquist*, the Supreme Court noted that

> [t]here are some forms of state action, . . . which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments. In such cases the rule that people should be "treated alike, under like circumstances and conditions" is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted. In such situations, allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise.

*Id.* at 603.

While this language in *Engquist* is expansive, the Court's actual holding was limited to the employment context, more specifically, the public employment context. *See id.* at 605 (noting that "the class-of-one theory of equal protection . . . is simply a poor fit in the public employment context"). And although "courts have [since] extended [Engquist's] rationale to other contexts in which a plaintiff is challenging a discretionary state action under a 'class of one' theory," *Solis v. Fresno Police Dep't*, No. 1:11-CV-00053 AWI GSA, 2011 U.S. Dist. LEXIS 90443, at *17 (E.D. Cal. Aug. 15, 2011), the Ninth Circuit has indicated that *Engquist* is not a bar where the state actor has a "pattern of generally exercising the discretion in a particular manner while treating one individual differently and detrimentally." *Towery v. Brewer*, 672 F.3d 650, 660-61 (9th Cir. 2012) (emphasis omitted). Given the Ninth Circuit's decision in *Towery*, the Court declines to dismiss the class-of-one claim based on *Engquist*.

There is, however, another problem with the class-of-one claim as pled in Plaintiffs' FAC. Both Supreme Court and Ninth Circuit case law make clear that the differential treatment accorded

to the plaintiff must be intentional in order to state a class-of-one claim. *See Olech*, 528 U.S. at 565 (taking note of allegation in the complaint that "the Village intentionally demanded a 33-foot easement as a condition of connecting her property to the municipal water supply where the Village required only a 15-foot easement from other similarly situated property owners"); *Gerhart v. Lake County*, 637 F.3d 1013, 1022 (9th Cir. 2011) (noting that, for the class-of-one claim, plaintiff was not required to show "the government officials' subjective bad feelings towards him . . . in order to meet the 'intent' requirement"; plaintiff simply had to "show that the Commissions intended to treat him differently from other applicants"). As the Ninth Circuit noted in *Gerhart*, there must be something to show that the plaintiff was "*intentionally singled . . . out*." *Id.* at 1023 (emphasis added); *see also North Pacifica LLC v. City of Pacifica*, 526 F.3d 478, 486 (concluding that defendant city "did not intentionally single out [plaintiff] for discriminatory treatment"). In *Gerhart* itself, there was evidence that the defendant commissioners singled out the plaintiff with respect to his permit application for a "road approach" because "a reasonable factfinder could find that the Commissioners were aware that their treatment of [the plaintiff's] permit application was anomalous [as] all three Commissioners testified that their ordinary practice of handling permit applications rarely, if ever, included denying applications." *Id.* at 1022. Furthermore, there was evidence suggesting that the Commissioners were aware of neighborhood complaints against the plaintiff prior to rendering a decision on his application and therefore they "might have intentionally singled him out." *Id.* at 1023. In contrast, in *North Pacifica*, the Ninth Circuit found that the plaintiff developer had not been intentionally singled out because the evidence established that the defendant city did not know of the differential treatment accorded by lower level administrators in the first place (*i.e.*, that the disputed permit condition had never been imposed on any previous development project). *See North Pacifica*, 526 F.3d at 486.

In the case at bar, Plaintiffs have alleged that Mr. Scocca was treated differently from at least some seventy other individuals who were granted CCW licenses. Plaintiffs have also made allegations to the effect that those individuals were similarly situated to Mr. Scocca – *i.e.*, because his moral character is "functionally equivalent" to that of the seventy licensees and because his good cause statement is "functionally equivalent" to those of the seventy licensees. FAC ¶¶ 31, 33. Even

14

assuming that the allegations of being similarly situated were adequate (the Court notes that the good moral character allegation, in particular, are conclusory), the Court is not satisfied that Plaintiffs have alleged enough to give rise to a plausible inference that the differential treatment accorded to Mr. Scocca was intentional, *i.e.*, that he was intentionally singled out.

For example, there is no allegation that Mr. Scocca brought to the sheriff's attention the specific argument that his good cause statement mirrored those of applicants who ultimately received licenses and who, like Mr. Scocca, also provide private investigator services. While Plaintiffs have alleged that, in October 2010, Mr. Scocca gave a spreadsheet to the sheriff "which documented various attributes of those persons issued licenses," FAC ¶ 25, and, presumably, one of those attributes was the good cause statements submitted by the individuals, that in and of itself is not enough. Plaintiffs have not alleged that Mr. Scocca alerted the sheriff to the similarity between his situation and the situation of at least some of the seventy licensees. Nor have Plaintiffs alleged any reason why Sheriff Smith would single Mr. Scocca out for disparate treatment. In short, Plaintiffs fail to state a plausible class-of-one claim with sufficient specificity.

In their opposition, Plaintiffs ask: "[W]hat would be the government's rational basis for denying a [CCW license]," particularly given that Mr. Scocca already has a "limited license to carry an exposed and loaded firearm in public when he is actively engaged in his employment duties." Opp'n at 13. But this argument misses the point. Under *Olech*, a plaintiff must allege both intentional differential treatment and a lack of a rational basis for that difference in treatment. Plaintiffs' question goes to the second prong of the *Olech* test; it does not address the first prong. Furthermore, the "limited license" referred to by Plaintiffs was issued by the California Department of Consumer Affairs (*see* Cal. Bus. & Prof. Code § 7521.5(b); id. at § 7521.5) not Sheriff Smith, and the carrying of a concealed weapon clearly raises at least some different concerns compared to open carry.

Accordingly, the Court dismisses without prejudice Plaintiffs' class-of-one claim against Sheriff Smith in her official capacity (as limited to prospective injunctive or declaratory relief). Plaintiffs have leave to amend the claim to add allegations giving rise to an inference of intentional discrimination. Should Plaintiffs decline, at this juncture, to amend, they will not be precluded from

1 seeking leave to amend at some later point in this litigation (if, *e.g.*, during discovery, they find
2 evidence to support a claim that Mr. Scocca was singled out for differential treatment).

D. <u>Claim Against Sheriff Smith in Her Individual Capacity</u>

Finally, the Court addresses the claim against Sheriff Smith in her individual capacity (which does not implicate any Eleventh Amendment concerns). As to this claim, Defendants argue that Sheriff Smith has qualified immunity. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). Thus, qualified immunity is a defense either if the plaintiff fails to make out a violation of a constitutional right or if the alleged violated right was not "clearly established at the time of defendant's alleged misconduct." *Id.* at 232 (internal quotation marks omitted).

Because the Court is dismissing without prejudice the class-of-one claim, it need not opine on whether Sheriff Smith has qualified immunity from such a claim. However, the Court is hard pressed at this juncture to imagine that, if Plaintiffs could prove intentional differential treatment and a lack of a rational basis for such treatment under the standard set forth in *Olech*, there would still be qualified immunity for the sheriff.

As for the fundamental right-based claim, it is a different story. As a preliminary matter, the Court notes that, even though it is staying proceedings on the fundamental-right based claim against the sheriff in her official capacity (with respect to prospective injunctive or declaratory relief only), it is still possible to rule on qualified immunity with respect to the claim against the sheriff in her individual capacity. This is because, for qualified immunity, the Court must consider what the clearly established law was at the time of the sheriff's decision to deny Mr. Scocca's application for a CCW license.

> "Clearly established" for purposes of qualified immunity means that "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent."

16

*Wilson v. Layne*, 526 U.S. 603, 614-15 (1999).

Turning to the merits, the Court acknowledges an equal protection based on the fundamental right doctrine was clearly established at the time of the sheriff's decision. *See, e.g.*, *Tutor-Saliba Corp. v. City of Hailey*, 452 F.3d 1055, 1061 (9th Cir. 2006) (noting that, where an equal protection claim is based on a suspect class or implicates fundamental rights, the claim is evaluated under a heightened standard; otherwise, rational basis scrutiny applies). The problem for Plaintiffs is that it was not clearly established at the time of the sheriff's decision (in 2008 and 2009 and even in 2010), there is a fundamental right protected by the Second Amendment to carry a concealed weapon *outside a person's home*. While *District of Columbia v. Heller*, 554 U.S. 570 (2008), had been decided prior to the sheriff's decision, *Heller* clearly focused on the right to self-defense in the home specifically.[3] *See id.* at 635 (stating that the Second Amendment "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home"); *see also United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010) (emphasizing that *Heller* focused on the right to self-defense in the home). Even if the Second Amendment right had been construed to extend beyond the home at the time of the sheriff's action herein, it was not clearly established that the Second Amendment encompassed the right to carry a *concealed* weapon outside the home. Indeed, as the pendency of *Richards* and *Peruta* make clear, that question remains unanswered even currently.[4] Accordingly, the Court finds that Sheriff Smith would have qualified immunity with respect to the fundamental right-based equal protection claim.

To the extent Plaintiffs argue that Sheriff Smith is not entitled to qualified immunity based on *Guillory v. City of Orange*, 731 F.2d 1379 (9th Cir. 1984), the Court does not agree. Plaintiffs claim that the sheriff in Guillory was denied qualified immunity, *see* Opp'n at 12, but the opinion

---

[3] The Court also notes that, at least at the time of the sheriff's decision in 2008 and 2009 (although not her decision in 2010), it was not clear that the Second Amendment applied to the states via the Fourteenth Amendment. That issue was not decided until *McDonald v. Chicago*, 130 S. Ct. 3020 (2010).

[4] *Moore v. Madigan*, Nos. 12-1269, 12-1788, 2012 U.S. App. LEXIS 25264 (7th Cir. Dec. 11, 2012), in which the Seventh Circuit recently held that the Second Amendment does apply to the carrying of concealed weapons outside the home, may or may not be followed in this circuit in *Richards* and *Perata*.

17

does not address the issue of qualified immunity at all. Furthermore, in *Guillory*, the plaintiffs argued that the sheriff violated their right to equal protection by arbitrarily and capriciously handling their applications for CCW permits. The Ninth Circuit held that the district court erred in preventing the plaintiffs from examining the sheriff about how he had handled the applications of other individuals. *See id.* at 1383. Nowhere in the opinion is it clear that the Guillory plaintiffs' equal protection claim was premised on a fundamental right, more specifically, the Second Amendment, as here. Indeed, the fact that the Guillory plaintiffs claimed that their applications were arbitrarily and capriciously handled suggests a class-of-one type claim rather than a fundamental right-based claim was at issue.

### III. CONCLUSION

For the foregoing reasons, the Court hereby grants in part and defers in part Defendants' motion to dismiss. More specifically:

(1) The Court dismisses with prejudice all claims against the County.

(2) The Court dismisses with prejudice the damages claim against Sheriff Smith in her official capacity.

(3) For the claim for prospective injunctive or declaratory relief against the sheriff in her official capacity, the Court dismisses without prejudice the class-of-one claim and defers ruling on the fundamental right-based claim (*i.e.*, until after the Ninth Circuit has issued a decision in *Richards* and *Peruta*). Plaintiffs have leave to amend the class-of-one claim within thirty days of the date of this order.

(4) Finally, the Court dismisses the equal protection claim based on fundamental rights asserted against the sheriff in her individual capacity on the basis of qualified immunity.

This order disposes of Docket No. 47.

IT IS SO ORDERED.

Dated: December 17, 2012

EDWARD M. CHEN
United States District Judge